No. 20-2160

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

  vs.

KEVIN VIGIL,

      Defendant-Appellant.

Appeal from the United States District Court for the District
of New Mexico, the Honorable Martha Vazquez
USDC NM CR No. 18-739 MV

_____

**APPELLANT'S OPENING BRIEF**

_____

ORAL ARGUMENT IS REQUESTED.

(Attachments in scanned PDF format)

<div style="margin-left:40%">

Devon Fooks
Attorney for Appellant
Assistant Federal Public Defender
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
devon_fooks@fd.org

</div>

February 26, 2021

# **TABLE OF CONTENTS**

Page

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**LIST OF ATTACHMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**STATEMENT REGARDING PRIOR OR RELATED APPEALS** . . . . . . . . v

**JURISDICTIONAL STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ISSUES PRESENTED FOR REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF THE FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Pretrial proceedings addressing the admissibility of A's statements under Fed. R. Evid. 803(1) and (2).</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Trial testimony</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**SUMMARY OF THE ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**I.     Because the Government Failed to Prove When the Events Described in A's Statements Reasonably Could Have Occurred, the District Court Erred in Admitting the Statements under Fed. R. Evid. 803(1) and (2).  A's Statements Were Also Inadmissible under Rule 803(2) because the Government Failed to Prove that A Was in a Continuous State of Excitement from the Described Event until her Statements.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**A.** *Standard of Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**B.** *As a General Rule, Hearsay Evidence Is Excluded Because It Is Unreliable.*  24

i

**C.**   *The Government Did Not Show that A's Statements Were Made Contemporaneously or Substantially Contemporaneously to the Events Described.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**D.**   *The Government Did Not Meet its Burden to Establish the Admissibility of A's Statements under Fed. R. Evid. 803(2).* . . . . . . . . . . . . . . . . . . . . . . . 28

**E.**   *The Erroneous Admission of A's Statements was not Harmless.* . . . . . . . . 31

**F.**   *Even under the Plain Error Standard, Mr. Vigil's Conviction Must Be Reversed.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**II.   The Government Failed to Meet Its Burden to Prove that the District Court Had Subject Matter Jurisdiction.** . . . . . . . . . . . . . . . . . . . . . . . . . 34

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**REQUEST FOR ORAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(g)** . . . . . . . . . . . . . . . . . . . . . . . 35

**CERTIFICATE OF PRIVACY REDACTIONS AND VIRUS SCANNING** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## LIST OF ATTACHMENTS

ATTACHMENT A: District Court Judgment in a Criminal Case

ATTACHMENT B: District Court Order on Motion in Limine, Doc. 188

ATTACHMENT C: District Court Memorandum Opinion and Order, Doc. 201

# TABLE OF AUTHORITIES

Cases                                                                                          Page

*Chambers v. Mississippi*,
410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Navarette v. California*,
572 U.S. 393 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Antonio*,
936 F.3d 1117 (10th Cir.),
*cert. denied*, 140 S.Ct. 818 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Beierle*,
810 F.3d 1193 (10th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Cordery*,
656 F.3d 1103 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Cotton*,
535 U.S. 625 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. E.F.*,
920 F.3d 682 (10th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Gonzalez-Huerta*,
403 F.3d 727 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Green*,
556 F.3d 151 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Harrison*,
743 F.3d 760 (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*United States v. Irvin*,
682 F.3d 1254 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Ledford*,
443 F.3d 702 (10th Cir. 2005),
*abrogated on other grounds by,*
*Henderson v. United States*, 575 U.S. 622 (2015) . . . . . . . . . . . . . . . . . . . . . . . 29, 31

*United States v. Lovato*,
950 F.3d 1337 (10th Cir.),
*petition for certiorari filed* (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 26

*United States v. Lozado*,
776 F.3d 1119 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Olano*,
507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Pursley*,
577 F.3d 1204 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 29, 30

*United States v. Smith*,
606 F.3d 1270 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Tisdale*,
248 F.3d 964 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Williamson v. United States*,
512 U.S. 594 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Statutory and Constitutional Authority

119 Stat. 2573 (2005), *codified at* 25 U.S.C § 331 Note . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 1152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2246 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rules of Evidence and Procedure

Fed. R. Crim. P. 51  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Evid. 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Evid. 803 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Other Authorities

4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence*, § 8:67 (4th ed. 2020)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Advisory Committee's Notes on Fed. R. Evid. 803(1), 28 U.S.C.App., p. 371  . . 25

Wright & Miller, 30B *Fed. Prac. & Proc. Evid.* § 6814 (2020 ed.) . . . . . . . . . . . 26

## **STATEMENT OF PRIOR OR RELATED APPEALS**

There have been no prior or related appeals in this case.

## JURISDICTIONAL STATEMENT

Defendant-Appellant Kevin Vigil appeals from the judgment and sentence of the United States District Court for the District of New Mexico, the Honorable Martha Vazquez presiding. The district court entered its judgment and sentence on October 30, 2020. Attachment ("Att.") A. The judgment was a final order that disposed of all claims with respect to all parties. Mr. Vigil timely filed a notice of appeal on October 30, 2020. ROA Vol. I, p. 389.[1]

The district court had jurisdiction of the cause below under 18 U.S.C. § 3231. This court has jurisdiction of this appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

**I.     In light of the government's failure to prove when the events described in the child's statements reasonably could have occurred, did the district court err in admitting the child's statements under Fed. R. Evid. 803(1) and (2)? Were the statements inadmissible as excited utterances because the government failed to prove the child was in a continuous state of excitement from the time of the described events until she made her statements?**

**II.     Did the district court lack subject matter jurisdiction?**

---

[1]     Mr. Vigil cites to the volume (Vol.), and PDF page (p.) numbers of documents and transcripts  included in the record on appeal.

1

## STATEMENT OF THE CASE

Defendant-Appellant Kevin Vigil was charged by indictment, filed in the United States District Court for the District of New Mexico, with two counts of engaging in a sexual act with a child, in violation of 18 U.S.C. §§ 1152, 2241(c), and 2246(2)(A) and (C).  ROA Vol. I, p. 28.  Count 1 charged a sexual act involving contact between the defendant's penis and the victim's anus; Count 2 charged a sexual act involving digital penetration of the victim's genital opening.. *Id.*

The government filed a pretrial motion in limine requesting a ruling permitting admission of a statement by alleged victim A[2] to her mother under Fed. R.Evid. 803(1) and (2).  *Id.* at 207.  Mr. Vigil argued in response that testimony concerning A's statements was inadmissible hearsay that did not meet the requirements of the cited exceptions.  *Id.* at 326.   After a hearing, the district court ruled that A's mother's testimony recounting the statements she said A made to her was admissible under both Rules 803(1) and (2).  Att. B.

Prior to trial, the government filed a Motion for Pretrial Determination of Indian Country Land Status.  ROA Vol. I, p. 72.  Mr. Vigil filed a response

---

[2]    The child was referred to at trial as "A," which is how Mr. Vigil refers to her here. She was also referred to as "A.W." during pretrial proceedings.

opposing the motion.  *Id.* at 89.  After hearing the parties' arguments, the district court entered an order ruling that federal criminal jurisdiction was proper.  Att. C.

Mr. Vigil received a jury trial.  The jury found him not guilty on Count 1 and convicted him Count 2.  ROA Vol. I, p. 381.

The district court sentenced Mr. Vigil to the mandatory minimum term of imprisonment of 30 years, to be followed by a three-year term of supervised release.  Att. A.  He timely filed a notice of appeal, ROA Vol. I, p. 389, and this appeal followed.

## **STATEMENT OF THE FACTS**

Pretrial proceedings addressing the admissibility of A's statements under Fed. R. Evid. 803(1) and (2).

The government filed a pretrial motion in limine seeking admission under Fed. R. Evid. 803(1) and (2) of statements purportedly made by A to her mother, Consuelo.[3]  *Id.* at 207.  It explained that it sought admission of testimony by Consuelo that on the way to the hospital, A stated, "Mom, my cookie (A's word for her vagina) hurts.  He put his fingers in my cookie.  I told him to stop and he said, 'be quiet.'"  *Id.* at 208.  The government also sought admission of Consuelo's

---

[3]  Because several trial witnesses had the same surname, Mr. Vigil refers to them by their first names.

testimony that A stated that Mr. Vigil "put his pee-pee" in her butt, that A told him, "stop, stop, that hurts," but that he continued to do it. *Id.*

The government argued that Consuelo's testimony about A's statements should be admitted under Rule 803(1) because "the statements describe the abuse immediately after the child was in Defendant's bed." *Id.* at 211. It argued that the testimony was admissible under Rule 803(2) because "[t]he time lapse between the startling event and declarations was brief–likely a matter of minutes; A.W. had just been taken from the scene." *Id.* at 213.

With respect to the Rule 803(1) requirement that a statement describe or explain an event or condition made while or immediately after the declarant perceived it, the government argued at the motions hearing that "there's no evidence to suggest there's some long time between the sexual assault and the time that A.W. made these statements. They were on the car ride to the hospital, perhaps minutes, not even an hour, after the child made them." ROA Vol. III, p. 103.

The government argued at the motions hearing that A's statements were admissible under Rule 803(2) because "I think it can be inferred that this child would still be under the stress of the excitement." *Id.* at 104. The government pointed to no evidence that A was under the stress of excitement of any event when

4

she left Mr. Vigil's home.  Instead, it pointed out that A was excitable when she made her statements, noting the exclamation points in the report of Consuelo's account of A's statements.  *Id.*

The government supported its motion in limine seeking admission of A's statements under Fed. R. Evid. 803(1) and (2), ROA Vol. I, p. 207, with documentation of the report Consuelo made at the time of A's sexual abuse examination.  *Id.* at 219.  Consuelo stated in that report that Mr. Vigil went to bed first and that about half an hour later, A said she wanted to sleep in bed with him. *Id.*  Although Consuelo suggested A sleep on the couch instead, Consuelo allowed A to join Mr. Vigil in bed.  *Id.*  After about a half hour, Consuelo checked on them and found both Mr. Vigil and A asleep, then returned to the kitchen.  *Id.*  After another half hour, she checked again, found them both asleep and snoring with Mr. Vigil's arms wrapped around A.  *Id.*  Consuelo again went back to the kitchen.  *Id.*

A later woke up and joined both her parents in the kitchen.[4]  *Id.*  Mr. Vigil came out about ten minutes later and they all sat together and talked.  *Id.*  Eventually, A got tired again and decided to return to the bedroom.  *Id.*  Mr. Vigil went back to bed about ten minutes after A did.  *Id.*  Consuelo then got up and used the bathroom and went from the bathroom to Mr. Vigil's bedroom.  *Id.*  She turned

---

[4]    Consuelo refers in her statement to A coming out to the kitchen with "us," which other evidence made clear referred to Consuelo and Tommy War, A's father.

5

on the bedroom lights and saw that Mr. Vigil and A were under the blankets. *Id.* She told Mr. Vigil to scoot over and climbed into bed next to A, who was in the middle. *Id.*

Consuelo reported that she heard a noise, felt a lot of movement, and heard a gasp she characterized as "gasping for air like a gasping kind of pain." *Id.* at 220. She reached over and felt that A was not wearing pants and that Mr. Vigil's underwear was pulled down and that his penis was erect. *Id.* She told A to get up and put on her shoes and socks. *Id.* When Mr. Vigil asked what was wrong, Consuelo told him they were leaving, then proceeded to get in the car and drive to the hospital. *Id.* Consuelo reported that on the way, A said that "he tried to put his PeePee in my butt and he also put his fingers in my cookie and over and over." *Id.*

Mr. Vigil argued in his response to the government's motion in limine that Consuelo's proposed testimony about A's statements should be excluded because she was an unreliable witness; his defense was that her accusations were untruthful. *Id.* at 326. He argued that A's statements were also inadmissible as excited utterances because there was no evidence that A was under a continuous stress of excitement from the time of the described events through the time of the statements. *Id.* at 326, 328. He pointed out that A was not upset or exhibiting any indication of stress or excitement when she left his home. *Id.* at 329.

At the hearing on the motion in limine, ROA Vol. III, p. 101, Mr. Vigil

reiterated his arguments that A's statements were inadmissible under Rules 803(1)

and (2).  He explained that the government failed to prove that A had been in a

continuous state of excitement when she made her statements.  *Id.* at 111.  Mr.

Vigil testified at the motion hearing that A was happy when she left his home in

the early morning hours of February 4, 2018.  *Id*. at 112.  On her way out the door,

A spoke to Tabatha, gave her a hug, gave him a hug, and said "goodbye, Uncle

Kevin."  *Id.* at 113.  The government presented no evidence to the contrary.

<u>Trial testimony.</u>

A did not testify at trial.

Consuelo began her trial testimony by admitting that the year before, she had

misrepresented A's urine as her own when she was drug tested in order to obtain

more pain medication; she had sustained a back injury in a car accident and had

taken pain medication for about ten years.  ROA Vol. III, p. 393, 423.  She also

admitted to her history of cocaine abuse and testified that she stopped using

cocaine eleven months prior to her testimony.[5] *Id.* at 393-94, 424.  She admitted to

stealing her sister's tax refund check and cashing it.  *Id.* at 394.

---

[5]    Consuelo testified on August 20, 2019.  According to her testimony, she stopped
using cocaine about September 2018; the incident at issue in this case occurred well before
that, in February 2018.

Consuelo testified that Mr. Vigil was a good friend whom she had known for fifteen years. *Id.* at 395. He and A's father, Tommy War, had been best friends who drank together nearly every day. *Id.* at 396. A referred to Mr. Vigil as Uncle Kevin. *Id.* at 940. Consuelo and Tommy had been married for twenty-three years; they divorced in 2004. *Id.* at 396. Consuelo had been involved in a short-term intimate relationship with Mr. Vigil. *Id.* at 396-97.

After drinking together on the afternoon of February 3, 2018, Consuelo, Tommy, and Mr. Vigil went with A about 5:30 p.m. to Mr. Vigil's home, located within the exterior boundaries of the Ohkay Owingeh Pueblo. *Id.* at 399, 405. Consuelo testified that A was happy and not complaining of any pain. *Id.* The three adults drank a 30-pack of beer and some shots. *Id.* at 400. Consuelo gave A a bath that evening at Mr. Vigil's home. *Id.* at 827.

Consuelo admitted at trial she had lied to the grand jury about how much she drank that day. *Id.* at 432. While she told Officer Romero she drank shots, she told the grand jury she drank beer. *Id.*

About 9:30 p.m. that night, Mr. Vigil went to his bedroom to sleep. *Id.* About 10 p.m., A said she was tired. *Id.* at 401. Consuelo told her to sleep on the couch, but allowed A to go to Mr. Vigil's bedroom and lie down on the bed with him when A said she wanted to do that. *Id.* Consuelo testified she checked on

8

them twice and found A and Mr. Vigil asleep both times. *Id.* at 401-02, 427. She saw nothing unusual. *Id.* at 429.

About 11:30 p.m., Mr. Vigil's daughter Tabatha came over to clean his house.[6] *Id.* at 402. Consuelo testified that Tabatha obtained some drugs that evening, but that she did not see anyone use them. *Id.* at 402-03.

Consuelo testified she joined A and Mr. Vigil in bed about 2:10 a.m. *Id.* at 403. Three minutes after getting in bed, she heard A moving and then heard her gasp. *Id.* at 406, 428. She reached over and found that A was not wearing pants or underwear, then reached toward Mr. Vigil and found his erect penis was exposed. *Id.* Consuelo got up, turned on the lights, and told A to get up. *Id.* at 406, 429. She testified that when Mr. Vigil asked what was wrong, she told him he knew what he had done. *Id.* at 407. After putting on A's shoes and socks, Consuelo, A, and Tommy got into the car and left about 2:30 a.m. *Id.*

Consuelo testified that as they left, A was "scared, shocked, crying and in pain." *Id.* They drove to the hospital about fifteen minutes away. *Id.* at 407, 425-26. Consuelo testified that on the way, A said, "Mamma, my cookie hurts and my butt hurts. Uncle Kevin put his fingers in my cookie and his pee-pee in my butt twice. And I told him to stop and he wouldn't." *Id.* at 407.

---

[6]    By the time of trial, both Tabatha and Tommy had passed away. ROA Vol. III, p. 106, 441.

At the hospital, Consuelo gave a statement to a tribal police officer and turned over A's clothing. *Id.* at 409-10. They drove to another hospital where A was given a sexual assault nurse examination ("SANE"), then went home. *Id.* at 411-12, 416-17. Consuelo testified that she wiped A after she used the restroom at the hospital and the tissue had blood on it. *Id.* at 417.

At the time of the sexual assault nurse examination, Consuelo reported that A had no history of vaginal itching, scratching, or redness. *Id.* at 431.

A's sister, Shanice, testified that in February 2018, she saw A about every other day and frequently took care of her. *Id.* at 442, 451. She picked A up from school on Friday, February 2, 2018, and A spent that night at Shanice's house. *Id.* at 443. A was not complaining of pain when Consuelo, Tommy, and Mr. Vigil picked her up about 2 p.m. on February 3, 2018. *Id.* at 446, 450.

A had suffered from repeated bouts of vaginal irritation so severe it caused bleeding and A's frequent scratching of her vagina. *Id.* at 444-45. About a month and a half before the day at issue in this case, A had vaginal irritation and redness that caused her to rub herself and complain of vaginal pain. *Id.* at 444, 452-53. About six months before February 4, 2018, Shanice noticed blood on A's underwear. *Id.* at 451. A year or so before February 4, 2018, A complained frequently of vaginal pain. *Id.* at 453. In 2015, Shanice took A to the hospital

because A had blood on her underwear, was scratching herself, and had a rash on her inner thigh.  *Id.* at 444-45.  Shanice saw blood on A's panties three different times; each of those times, A would scratch her vagina and complain that it hurt. *Id.* at 454.  A stayed with Shanice about every other weekend and almost every time, A had noticeable bruises; one time, she had a blistered lip.  *Id.* at 453.

Twenty-five year old Tommy War Jr. ("Tommy Jr."), A's brother, testified that he and his girlfriend, Jessica Trujillo, lived together and that A had lived with them since February 15, 2018.  *Id.* at 814.  Before that, A had lived with Consuelo and stayed with him about once or twice a month.  *Id.* at 814-15.  As he told Agent Romero when questioned about the allegations in this case, Tommy Jr. had seen bruises on A's arms, hand prints on her back, bruises on her butt, and scratches on her vagina.  *Id.* at 817.  He also reported that A was always scratching her genital area.  *Id.* at 818.  A was often dirty when she was in Consuelo's care and he assumed A's scratching was related to being so dirty.  *Id.* at 818-19.  Tommy Jr. also told Agent Romero that Consuelo rarely bathed A and it upset him that Consuelo did not bathe A often enough.  *Id.* at 824-25.  He was unaware of any vaginal problems A was experiencing just before February 4, 2018.  *Id.* at 822.

When questioned two days after the day at issue in this case, Tommy Jr. reported that Consuelo drank or smoked crack every night.  *Id.*  at 819-20.

11

Consuelo, Tommy, and A had lived with Tommy Jr. for a period of time four to six months before February 4, 2018. *Id.* at 825-26. Tommy Jr. also reported that he had seen Mr. Vigil smoke crack a number of times. *Id.* at 823.

Jessica Trujillo, Tommy Jr.'s girlfriend of seven years, picked A up from school on February 5, 2018. *Id.* at 796, 798. A told Jessica that day she wanted to live with her and Tommy Jr. and not be returned to her mother. *Id.* at 799, 810. The same day, A informed Jessica that something had happened to her and that Consuelo had told A she could not say anything about it or A would die. *Id.* at 800. A also stated the same day that her mother told her what she should tell the doctor. *Id.* at 800, 809.

Jessica testified that during the summer of 2017, she bought new clothes for A to wear to a birthday party for Jessica's sister because A was dirty and wearing dirty clothes when Consuelo dropped her off at Jessica's house. *Id.* at 804-05. As she helped A change into the new clothes, A asked Jessica to see if her vagina was bleeding. *Id.* at 807. Jessica saw that A's vaginal area was red and had scratches on it. *Id.* at 806. Jessica informed Consuelo of her observations. *Id.* at 807. Jessica also informed Consuelo she had seen a burn mark on A's lip after A complained that it hurt. *Id.* at 801-03.

A complained to Jessica in 2016 that Consuelo's boyfriend Kurt would wrap her in a blanket and put her face in the smoke of a fire; other times, he would pinch her ears and the back of her arms. *Id.* at 808-09. When Kurt did those things to A, Consuelo would laugh. *Id.* at 808. A also told Jessica that Consuelo and Kurt would sometimes refuse to let her eat. *Id.* at 809.

Mr. Vigil testified that on February 3, 2018, he made breakfast for Consuelo and Tommy and went with them early in the afternoon to pick up A at Shanice's house. *Id.* at 915-16. The four of them came back to his house after picking up some food around 4 or 4:30 p.m. *Id.* at 916. Consuelo bathed A in his bathroom and used the only towel he had that was not in the laundry, one that he had been using for several days. *Id.* at 920, 956.

While at Mr. Vigil's home, Consuelo and Tommy called a friend who brought them cocaine. *Id.* at 923. They made it into crack. *Id.* at 924. When they had done this previously, Consuelo and Tommy had gone out to their car; because A was asking to go with them, Mr. Vigil let them do it inside his house that evening so A could continue playing with toys he kept for his grandkids. *Id.* at 925. Later, Consuelo and Tommy called someone again to bring cocaine, which they again smoked. *Id.* at 929. After Tabatha came to Mr. Vigil's house to clean

it, Consuelo and Tommy asked her to call someone she knew to get more cocaine; they purchased cocaine from that person and smoked that too.  *Id.* at 929-30.

Mr. Vigil testified he went to bed about 11 or 11:30 p.m. while everyone else stayed in the kitchen and living room.  *Id.* at 931-32.  Later, A came back to his bedroom and laid down on the bed with him.  *Id.* at 936.  After A was asleep, Consuelo came into his bedroom, moved A over, and squeezed between him and A.  *Id.* at 937.  Consuelo reached into his pants and began to rub his leg and fondle his penis.  *Id.* at 937-38.  He rebuffed her, saying her daughter was right there.  *Id.* Consuelo kept insisting and he continued to resist.  *Id.* at 938.  Eventually, Consuelo got mad and went back to the living room, then returned and told A they were leaving.  *Id.* at 938.  After A gave Tabatha and Mr. Vigil a hug, Consuelo, Tommy, and A got in their car and left.  *Id.* at 939-40.

The next day, FBI agents came to Mr. Vigil's house and accused him of improperly touching A.  *Id.* at 941-42.  Mr. Vigil fully cooperated with them; he gave a saliva sample and allowed the agents to search his home.  *Id.* at 943.  He denied that he had improperly touched A.  *Id.* at 944.

Sexual Assault Nurse Examination ("SANE") Nurse Corine Luna, who examined A at the hospital, testified that she observed vaginal redness and weeping, and A was in a lot of pain.  *Id.* at 481, 485.  Nurse Luna examined A

14

while she was briefly sedated and noted abrasion, notches unrelated to an injury that could have reflected normal variation, a bruise that could have come from attempted penetration, a scratch that a fingernail could possibly have caused, and petechia suggesting recent physical force. *Id.* at 503, 510, 514, 531. A required no immediate medical intervention. *Id.* at 537.

A had bleeding that was not acute from a source that was not identified. *Id.* at 521. Urinary tract infections can cause bleeding; kidney infections can cause blood in urine. *Id.* at 522. Nurse Luna did nothing to follow up with A or her family. *Id.* at 531.

SANE nurse Judy Malmgren testified from her review of the photos and records of the SANE exam that an inadequate number of photos was taken and that the ones that were taken were of poor quality. Id. at 759. The photos did not show the conditions described in the SANE report. *Id.* at 760. SANE protocols call for a follow-up exam, which helps to verify the accuracy of the initial report. *Id.* at 762. A urinary tract infection, which A was not tested for, could have caused pain and blood in the urine. *Id.* at 762, 769. Scratching can cause skin abrasions. *Id.* at 765. A's symptoms suggested an underlying medical condition such Lichen's Sclerosus, which can mimic signs of sexual abuse. *Id.* at 764, 771. The SANE report noted anal gaping while A was sedated that could have been an effect of the

relaxation that sedation causes. *Id.* at 766. A had bilateral redness suggestive of a viral or bacterial infection; redness caused by an injury would normally not be bilateral. *Id.* at 766, 768.

DNA testing results showed no semen on A's clothing or on vaginal and anal swabs; saliva was "presumptively indicated" on underwear worn by A. *Id.* at 627, 634-35. A and Mr. Vigil could not be excluded as contributors. *Id.* at 641. The amylase test that was used did not indicate whether the saliva came from a male or female. *Id.* at 680.

DNA from at least three males was found on A's vaginal and anal swabs; it was unclear which individual contributed the most. *Id.* at 708-09, 712, 727. The government told the jury in its opening statement that "there's two or three unknown male DNAs on her anus. It can't really be explained." Transcript of opening statements,[7] p. 11. A and Mr. Vigil were possible contributors to the DNA found on swabs of A's mons pubis and outer labia majora, which also showed DNA from an unknown individual. ROA Vol. III, p. 635, 713-14. The DNA that was detected seemed to have come from direct contact, but could have come from secondary transfer. *Id.* at 697-98.

---

[7]    This transcript is not part of the record on appeal; Mr. Vigil will file a motion to supplement the record with it.

A is an enrolled member of the Ohkay Owingeh Tribe; Mr. Vigil is a non-Indian; the charged offense occurred on non-Indian owned land within the exterior boundaries of the Ohkay Owingeh Pueblo.  Mr. Vigil argued that Congress "otherwise provided" within the meaning of the 2005 Amendments to the 1924 Pueblo Land Act, 119 Stat. 2573 (2005), *codified at* 25 U.S.C § 331 Note, when it extinguished Pueblo title and relinquished all federal interest in the land in question.  The district court rejected his argument and upheld federal jurisdiction. Att. C.

## SUMMARY OF THE ARGUMENT

A's statements contained unreliable hearsay that Fed. R. Evid. 803(1) and (2) were designed to exclude.  The statements were plainly inadmissible under both rules because the government did not prove when the sexual abuse described in the statements could reasonably have taken place.  A was in Mr. Vigil's bed with him during three time frames delineated by Consuelo.  The evidence did not show that the sexual abuse described in A's statements could reasonably have occurred during any of those three time frames.

The first time frame was after A initially went to bed, when Mr. Vigil was already in bed.  Consuelo came into the bedroom twice and checked on them and found them sound asleep both times.  Later, A got up, went out to the kitchen and

17

living room, and spoke with both her parents for ten minutes while Mr. Vigil remained in bed.  Consuelo noted nothing out of the ordinary about A during this ten minutes.  A was apparently fully dressed.  Mr. Vigil later came out and talked with Consuelo, Tommy, and A; again, A showed no indication that anything upsetting had occurred.  When A got tired, she decided to return to Mr. Vigil's bed. There was no evidence that the sexual abuse described by A occurred before A got out of bed and spent ten minutes with her parents in the kitchen and living room.

The second time period related by Consuelo was the brief time while she used the bathroom.  When Mr. Vigil went back to bed, Consuelo got up and went to the bathroom.  She then went to Mr. Vigil's bedroom and turned on the lights. There was no evidence that the sexual abuse described by A occurred during the brief time while Consuelo was in the bathroom.  With the aid of the bedroom lights, Consuelo saw Mr. Vigil and A in bed, observed nothing out of the ordinary, and did not report that she noted either A or Mr. Vigil was even awake.

The third time period related by Consuelo was the three minutes during which she reported she laid in bed with A and Mr. Vigil.  A's statement described Mr. Vigil putting his penis in her anus twice while she told him to stop and he told her to be quiet.  Consuelo did not hear A or Mr. Vigil say anything; she heard only movement and a gasp.  It defies common sense to conclude that A could have been

anally penetrated twice in three minutes as her mother lay awake and oblivious right next to her.  There was no evidence that A was awake before Consuelo told her to get up and get ready to leave.

A's statements were wrongly admitted under Rules 803(1) and (2) because the government failed prove the sexual abuse described in the statements took place during the night of February 3-4, 2018.  The evidence did not show that A's statements were made contemporaneously or substantially contemporaneously to the events described.  Statements admitted as present sense impressions and excited utterances are presumed reliable because, respectively, they are made during or immediately after the event described or they are made during a state of continuous excitement following the described event.  The evidence did not show that A made her statements within a time proximate to the events she described.

Without proof of when the events described in A's statements reasonably could have occurred, the government failed to show that A was in a continuous state of excitement from the time of the described events until she made her statements, as required for admissibility under Rule 803(2).  Further, there was no report that A was upset when she got out of bed or at any time prior to getting in the car.  Mr. Vigil's testimony that A was calm when she hugged Tabatha and him

and left his home was the only evidence of A's emotional state before she got in

the car to leave.

## ARGUMENT

**I.    Because the Government Failed to Prove When the Events Described in A's Statements Reasonably Could Have Occurred, the District Court Erred in Admitting the Statements under Fed. R. Evid. 803(1) and (2).  A's Statements Were Also Inadmissible under Rule 803(2) because the Government Failed to Prove that A Was in a Continuous State of Excitement from the Described Event until her Statements.**

**A.** *Standard of Review.*

This court reviews the admission of evidence over a hearsay objection for

abuse of discretion in light of the record as a whole.  *United States v. Pursley*, 577

F.3d 1204, 1220 (10th Cir. 2009); *United States v. Lovato*, 950 F.3d 1337, 1341

(10th Cir.), *petition for certiorari filed* (2020).

Mr. Vigil argued below that Consuelo's testimony concerning A's

statements was inadmissible under Fed. R. Evid. 803(1) and (2).  ROA Vol. I, p.

326; ROA Vol. III, p. 109-113.  While he did not explicitly argue that the

government had not established when the sexual abuse described in A's statements

reasonably could have taken place, this court should rule that his challenge to the

admissibility of A's statements adequately preserved the evidentiary issues he

raises here.  Mr. Vigil pointed out in his response opposing the government's

motion in limine that statements are presumed trustworthy under Rule 803(1)

20

because of the requirement of "substantial contemporaneity of event and statement." ROA Vol. I, p. 327.  He argued that A's statements were inadmissible under Rule 803(2) because the circumstances did not show that A was in a continuous state of excitement from the time of the event through the time of her statements.  *Id.* at 328-29.

By their terms, Rules 803(1) and (2) condition admissibility on a close proximity between the occurrence of the events described in a statement and the making of that statement.  Rule 803(1) limits admissibility to a statement "made while or immediately after the declarant perceived it.  Rule 803(2) requires that the statement be "made while the declarant was under the stress of excitement that [the startling event] caused."

The pertinent question in determining whether an issue was preserved is "whether the district court was adequately alerted to the issue."  *United States v. Garcia,* 936 F.3d 1128, 1132 (10th Cir.), *cert. denied*, 141 S.Ct. 139 (2020) (quoting *United States v. Harrison*, 743 F.3d 760, 763 (10th Cir. 2014)).  Here, the district court recognized that Rule 803(1) requires that the statement and the described event be "substantially contemporaneous."  Att. B at 3.  It concluded that A's "statements were made in a time period that was 'substantially contemporaneous' with the event in question" and that "AW's statements on the

21

way to the hospital were made shortly after experiencing the alleged event." *Id.* at 5. With respect to admissibility under Rule 803(2), the court noted that "the amount of time between the event and the statement" was "[a]mong the more relevant factors" it must weigh. Att. B at 4. It found that "there was a short amount of time between the event and the statement . . ." *Id.* at 5. The district court's findings demonstrate that the court "was adequately alerted" to the need to ascertain when the events described in A's statements reasonably could have occurred in order to determine their admissibility under Rules 803(1) and (2).

This court has repeatedly found issues to have adequately preserved for appeal despite a lack of precision in objecting below. In *United States v. E.F.,* 920 F.3d 682, 687 (10th Cir. 2019), for example, this Court determined that E.F. adequately preserved an objection that the government acted in bad faith by failing to file a motion for downward departure under § 3553(e). *Id.* at 687. This Court explained that under Fed. R. Crim. P. 51(b), an issue is preserved for appeal where a party "inform[s] the court [of] the party's objection to the court's action and the grounds for that objection." *Id.* Although E.F. had not used the word "breach" or specifically accused the government of acting in "bad faith," E.F. made the district court aware that he thought the government did not meet its obligation to determine in good faith how to reward E.F.'s substantial assistance. A ruling that

22

the issue was insufficiently preserved "would promote form over substance . . ." *Id.*

In *Harrison,* the government argued that the defendant failed to specifically preserve the issue of the drug quantity used to calculate the sentence.  The defendant had not objected before sentencing to the presentence report; at sentencing, her counsel affirmed that she had no objections to the presentence report and made no argument about the drug quantity calculation.  However, the defendant did tell the district court that she disagreed with "the amounts that were on there."  743 F.3d at 763.  This Court held that her *pro se* objection, while "certainly imprecise," adequately preserved the issue of whether the trial evidence supported the drug quantity calculation.  *Id.  See also United States v. Tisdale*, 248 F.3d 964, 976 (10th Cir. 2002) (defendant's objection to the imposition of consecutive sentences was adequately preserved by a request for concurrent sentences without citation of pertinent legal authority).

This case presents stronger facts supporting preservation than those this Court ruled sufficient in *Harrison* and *Tisdale.*  The district court made express findings concerning the time lapse between the events described in A's statements and her statements.  As in *E.F.,* this court's ruling that Mr. Vigil insufficiently alerted the district court to his evidentiary arguments "would promote form over

23

substance." This court should rule that Mr. Vigil adequately preserved the issues he raises in this appeal.

Mr. Vigil is entitled to reversal of his conviction even under the plain error standard. Under that standard, this Court will reverse the district court judgment if there is: (1) error; (2) that is plain; and (3) affects substantial rights. If these three criteria are met, this court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Cotton*, 535 U.S. 625, 631 (2002); *United States v. Beierle*, 810 F.3d 1193, 1200 (10th Cir. 2016).

**B.**    *As a General Rule, Hearsay Evidence Is Excluded Because It Is Unreliable.*

"Hearsay is generally inadmissible as evidence because it is considered unreliable." *United States v. Lozado*, 776 F.3d 1119, 1121 (10th Cir. 2015)(citation omitted).

> The hearsay rule... is premised on the theory that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements--the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine--are generally absent for things said out of court.

*Williamson v. United States*, 512 U.S. 594, 598 (1994). *See also Chambers v. Mississippi*, 410 U.S. 284, 288 (1973)(hearsay is generally untrustworthy and lacks traditional indicia of reliability);

Hearsay evidence is inadmissible at trial unless it falls within a hearsay exception. Fed. R. Evid. 802. The proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception. *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012).

**C.**  *The Government Did Not Show that A's Statements Were Made Contemporaneously or Substantially Contemporaneously to the Events Described.*

Federal Rule of Evidence 803(1) provides an exception to the rule against hearsay for "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). Statements admitted under 803(1) are deemed trustworthy because the "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *Navarette v. California*, 572 U.S. 393, 399-400 (2014) (quoting Advisory Committee's Notes on Fed. R. Evid. 803(1), 28 U.S.C.App., p. 371).

Rule 803(1) expressly requires that the declarant's statement be made during or "immediately after" the event the statement describes. "The time requirement is

25

strict because it is *the* factor that assures trustworthiness."  4 Christopher B.

Mueller and Laird C. Kirkpatrick, *Federal Evidence*, § 8:67 (4th ed. 2020)

(emphasis in original) ("Mueller").  *See also United States v. Green*, 556 F.3d 151,

155-56 (3rd Cir. 2009) ("the temporality requirement must be rigorous because the

passage of time–or the lack thereof–is the effective proxy for the reliability of the

substance of the declaration; hence the greater the passage of time, the less

trustworthy the statement is presumed to be, and the more the scales should tip

toward inadmissibility.").

Consistent with the Advisory Committee Notes, this court has explained that

a statement is sometimes admissible under 803(1) despite a "slight lapse" of time

between the event and statement.  *Lovato*, 950 F.3d at 1346.  "When it is clear,

however, that a description did not 'immediately' follow the described event,

admission is not warranted under Rule 803(1)."  Wright & Miller, 30B *Fed. Prac.

& Proc. Evid.* § 6814 (2020 ed.).  Statements may not be admitted under 803(1) to

prove past acts or events based on "the mere fact that the statement refers to or

expresses some present perception."  Mueller, § 8:67.

The evidence clearly shows that A's statements did not "immediately"

follow the described events.  The evidence does not support the district court's

assumption that Consuelo's observations coincided with the anal penetration

26

described in A's statements.  It defies common sense to conclude that A could have been anally penetrated twice during the three minutes that Consuelo was lying beside her.  ROA Vol. III, p. 428.  While A's statement reported that she told Mr. Vigil to stop and he told her to be quiet, Consuelo did not report hearing A or Mr. Vigil say anything.  ROA Vol. I, p. 220; Vol. III, p. 430.

The sexual abuse described in A's statements also could not reasonably have occurred during the other two time periods delineated by Consuelo that A was in Mr. Vigil's bed.  The first was before A got out of bed and spent ten minutes talking with both her parents in the living room while Mr. Vigil remained in bed. ROA Vol. I, p. 219.  Consuelo had checked on A and Mr. Vigil twice during this initial interval and found them both sleeping soundly.  ROA Vol. III, p. 401-02, 427, 429.  Consuelo did not report that when A came out of the bedroom, she showed any sign of distress, lacked any clothing, or was in any way disheveled. While A was still up, Mr. Vigil came out to the living room and spent time talking with everyone and again, there was no apparent sign of upset of A's part.  ROA Vol. I, p. 219.  A then chose to return to Mr. Vigil's bed.  *Id.*

The remaining period of time Consuelo delineated while A was in Mr. Vigil's bed was the brief time Consuelo used the bathroom as Mr. Vigil returned to bed.  *Id.*  The evidence does not support a reasonable conclusion that A was anally

27

penetrated twice during this brief interval.  Consuelo came into Mr. Vigil's bedroom after using the bathroom and turned on the lights when she did so.  *Id.* She reported no indication that A or Mr. Vigil was awake or in any way upset.

The district court wrongly assumed that the 803(1) requirement of "substantial contemporaneity" between event and statement was met because "Ms. War allegedly took A.W. to the hospital immediately after her observations, and thus, A.W.'s statements on the way to the hospital were made shortly after experiencing the alleged event."  Att. B at 5.  Because the evidence does not support the district court's assumption that A was anally penetrated twice during the three minutes she lay next to her mother, apparently asleep, or just prior to that time, the circumstances did not logically support the court's assumption that A's statements were ''substantially contemporaneous" with the events she described. The government failed to prove that the events described in A's statement took place at any point during the night of February 3-4, 2018.

**D.**    *The Government Did Not Meet its Burden to Establish the Admissibility of A's Statements under Fed. R. Evid. 803(2).*

Fed. R. Evid. 803(2), known as the excited-utterance exception, provides a hearsay exception for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  For admissibility as an excited utterance, a statement must meet three requirements: (1)

a startling event; (2) the statement was made under the stress of the event's excitement; and (3) a nexus between the content of the statements and the event. *United States v. Smith*, 606 F.3d 1270, 1279 (10th Cir. 2010). The relevant factors the court must weigh include: the time lapse between the event and the statement; the nature of the event; the subject matter of the statement; the declarant's age and condition; the presence or absence of self-interest; and whether the statement was volunteered or prompted by questioning. *Pursley*, 577 F.3d at 1220.

The rationale of the excited utterance exception is that "the agitated mind is much less likely to engage in conscious fabrication than the reflective mind." *United States v. Ledford*, 443 F.3d 702, 711 (10th Cir. 2005), *abrogated on other grounds by, Henderson v. United States*, 575 U.S. 622 (2015) (citing Fed. R. Evid. 803(2) advisory committee's note). "The temporal proximity between the startling event and [the statement] requires close analysis." *Id.* at 710.

Here, the government did not show when the sexual abuse described in A's statements reasonably could have taken place and did not show that A was in a state of continuous excitement from the time of the described events until the time of the statement. The district court based its finding that "there was a short amount of time between the event and the statement," Att. B at 5, on its incorrect assumption that the events described in A's statements coincided with Consuelo's

observations–that is, that they occurred during the three minutes that Consuelo was lying next to A. *See id.* ("Ms. War allegedly took A.W. to the hospital immediately after her observations, and thus, A.W.'s statements on the way to the hospital were made shortly after experiencing the alleged event.").  The district court failed to recognize the considerable difference between what Consuelo observed and what A was said to have reported in her statements.  As discussed above, the evidence does not support a reasonable conclusion that A was anally penetrated twice while her mother lay awake beside her.

While the district court found that A was in a state of excitement when she made her statements, it did not find, and the evidence did now show, that A was in any way upset when she got out of bed or when she left Mr. Vigil's home.  *See* Att. B at 6 ("[a]s to A's condition at the time of the statement, although Mr. Vigil testified that AW was calm when she left the home, AW's mother observed that she was upset and crying at the time she made the statements." (citing *Pursley*, 577 F.3d at 1220)).  The only evidence concerning A's condition prior to leaving Mr. Vigil's home was that she calm.  Because the government did not demonstrate a continuous state of excitement from event to statement, A's statements were inadmissible hearsay.

**E.**    *The Erroneous Admission of A's Statements was not Harmless.*

The government has the burden of proving that a non-constitutional error was harmless. *Ledford*, 443 F.3d at 712.  It cannot do so in this case.  The district court's erroneous admission of a statement is not harmless if the error "substantially influenced" the trial outcome or left "grave doubt" as to whether it did so. *Id.*

A's wrongly admitted statements were profoundly prejudicial.  Once the jury heard that a young child in considerable pain made graphic accusations of sexual penetration against Mr. Vigil, his conviction was all but inevitable.  Although A's accusation that Mr. Vigil twice anally penetrated her was the only evidence that he did so, he was denied the ability to challenge the truth of that accusation through cross-examination.

Mr. Vigil was also unable to counter the  jury's likely assumption of the truth of the accusations contained in A's statements based on her evident knowledge of sexual acts normally unfamiliar to a six-year-old.  The district court disallowed Mr. Vigil from informing the jury of previous sexual abuse A had suffered at the hands of other individuals in light of Fed. R. Evid. 412.  ROA Vol. III, p. 839-842.

A's wrongly admitted statements were the foundation of the government's case and almost certainly had a substantial influence on the verdict. The government emphasized A's statements in both its opening and closing argument. *See* transcript of opening statements at 7, 8; ROA Vol. III at 1002, 1031, 1036.

Because the record does not show that the erroneous admission of A's statements did not affect the verdict or had only a slight effect, this court should hold that the evidentiary errors were not harmless.

**F.**    *Even under the Plain Error Standard, Mr. Vigil's Conviction Must Be Reversed.*

An error is plain when it is "clear under current law." *United States v. Olano*, 507 U.S. 725 (1993). Because the evidence did not permit a reasonable conclusion that the events described in A's statement took place on the night of February 3-4, 2018, the district court plainly erred in admitting A's statements under those rules. The error is "clear or obvious" because the admission of A's statements without proof of when the described events occurred violates both the terms of those rules and courts' consistent interpretations of them. *See United States v. Cordery*, 656 F.3d 1103, 1106 (10th Cir. 2011). As the district court recognized, Rule 803(1) plainly requires that a statement be "substantially contemporaneous" with the described events. Att. B at 3. The court also

recognized that the time lapse between event and statement is an important consideration under Rule 803(2). *Id.* at 4.

Under the third prong of the plain error standard, a reasonable probability must be shown that without the error, the result of the proceeding would have been different. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005). A's statements were fundamental to the government's case. They raised the most serious accusations lodged against Mr. Vigil. The erroneous admission of A's statements caused extreme prejudice. Few accusations cause revulsion more intense than those of a young child describing the pain of sexual abuse. Because only A had firsthand knowledge of those accusations and she did not testify , Mr. Vigil was denied a realistic opportunity to challenge the truth of her accusations.

This court will exercise its discretion to rectify a plain error where it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 736. There can be little question that allowing Mr. Vigil's wrongful conviction and 30-year sentence to stand under these circumstances would seriously undercut the fairness, integrity, and reputation of judicial proceedings.

**II.      The Government Failed to Meet Its Burden to Prove that the District Court Had Subject Matter Jurisdiction.**

Mr. Vigil argued in the district court that Congress precluded the exercise of federal criminal jurisdiction over offenses occurring on the land where Mr. Vigil lives when it extinguished all right, title, and interest of Ohkay Owingeh Pueblo to that tract and relinquished all interest of the United States.  After hearing evidence and argument concerning the land status, ROA Vol. III, p. 75-85, the district court ruled that federal jurisdiction was proper.  Att. C.

Mr. Vigil recognizes that this court rejected a similar jurisdictional argument in *United States v. Antonio*, 936 F.3d 1117 (10th Cir.), *cert. denied*, 140 S.Ct. 818 (2020).  He raises this issue to preserve it in order to seek certiorari from the United States Supreme Court.

<u>**CONCLUSION**</u>

Without doubt, child sexual abuse is a horrendous crime that causes its victims grievous and lasting harm.  The mere accusation of child sexual abuse can provoke repugnance.  As the government told the jury, child sexual abuse offenses involve "some of the darkest stuff that happens in our society . . . "  ROA Vol. III, p. 1032.  These cases demand that courts take great pains to enforce the rules that prevent convictions based on unreliable evidence.

34

For the reasons stated above, this Court should hold that the district court erred in admitting A's hearsay statements, that the error was not harmless, and remand this case for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Kevin Vigil requests oral argument in order to clarify his position with respect to the important evidentiary issues presented in this appeal and respond to any questions of the panel that the parties have not adequately covered in their briefs.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
devon_fooks@fd.org


   /s/   Devon Fooks
Devon Fooks
Attorney for Appellant


## CERTIFICATE OF COMPLIANCE WITH FEDERAL
## RULE OF APPELLATE PROCEDURE 32(g)

I, Devon Fooks, counsel for Defendant-Appellant Kevin Vigil, certify that this brief-in-chief conforms to the type-volume limitations of Federal Rule of

Appellate Procedure 32(g).  The brief is typed in a proportionally spaced 14-point

type.  Excluding table of contents, table of citations, statement regarding oral

argument, and certificates of counsel, it contains 8237 words.

devon_fooks@fd.org

  /s/   Devon Fooks
Devon Fooks
Attorney for Defendant-Appellant

## CERTIFICATE OF PRIVACY REDACTIONS AND VIRUS SCANNING

I, Devon Fooks, certify that all required privacy redactions have been made

and, with  the exception of those redactions, every document submitted in Digital

Form is an exact copy of the written document filed with the Clerk and that the

digital submissions have been scanned for viruses with the most recent version of a

commercial virus scanning program, i.e., Norton Antivirus Corporate Edition,

Program Version 12.671.4971, updated February 26, 2021, and according to the

program, are free of viruses.

  /s/   Devon Fooks
Attorney for Defendant-Appellant

## <u>CERTIFICATE OF SERVICE</u>

I, Devon Fooks, certify that an original of this document was sent by first class mail, postage prepaid, to the Clerk of the Court of Appeals for the Tenth Circuit, Byron White United States Courthouse, 1823 Stout Street, Denver, Colorado 80257, and that it was electronically filed on February 26, 2021, using this Court's CM/ECF system.  I also certify that counsel for the government is a registered CM/ECF user and that service will be accomplished by the CM/ECF system.  Upon notification of approval, seven copies will be mailed to this court.

FEDERAL PUBLIC DEFENDER
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
devon_fooks@fd.org

  /s/  Devon Fooks
Devon Fooks
Attorney for Appellant

37

# ATTACHMENT A

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT
## District of New Mexico

UNITED STATES OF AMERICA

v.

**KEVIN VIGIL**

**Judgment in a Criminal Case**

Case Number:  **1:18CR00739-001MV**
USM Number:  **95943-051**
Defendant's Attorney:  **Devon Fooks**

## THE DEFENDANT:

☐  pleaded guilty to count(s) .

☐  pleaded nolo contendere to count(s)  which was accepted by the court.

☒  was found guilty on count(s) **2**  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. Sec. 2241(c) and 18 U.S.C. Sec. 2246(2)(C) | Aggravated Sexual Abuse | 02/04/2018 | 2 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 .

☒  The defendant has been found not guilty on count(s) **1**.

☐  Count(s)  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**September 22, 2020**
Date of Imposition of Judgment

**/s/ Martha Vazquez**
Signature of Judge

**Honorable Martha Vazquez**
**United States District Judge**
Name and Title of Judge

**October 30, 2020**
Date

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 2 - Imprisonment

Judgment - Page 2 of 7

DEFENDANT: **KEVIN VIGIL**
CASE NUMBER: **1:18CR00739-001MV**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:  **360   months**.

☒ The court makes the following recommendations to the Bureau of Prisons:

   **FCI Florence, Phoenix or Tucson.**

☒    The defendant is remanded to the custody of the United States Marshal.
☐    The defendant shall surrender to the United States Marshal for this district:
        ☐    at  on .
        ☐    as notified by the United States Marshal.
☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
        ☐    before 2 p.m. on .
        ☐    as notified by the United States Marshal.
        ☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to

_____  at  _____  with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 – Supervised Release

Judgment - Page 3 of 7

DEFENDANT: **KEVIN VIGIL**
CASE NUMBER: **1:18CR00739-001MV**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:  **5 years** .

### MANDATORY CONDITIONS

1.   You must not commit another federal, state, or local crime.

2.   You must not unlawfully possess a controlled substance.

3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(Check, if applicable.)*

4.   ☐   You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5.   ☒   You must cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable)*

6.   ☒   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state, local, or tribal sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.   ☐   You must participate in an approved program for domestic violence. *(Check, if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

### STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.   You must answer truthfully the questions asked by your probation officer.

5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, require you to notify that person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

14. You must undergo a sex offense-specific assessment to determine the level of risk for sexual dangerousness, recidivism, and amenability to treatment and formulate treatment recommendations if treatment is necessary. You may be required to pay all, or a portion of the cost of the assessment.

15. You will waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer shall disclose the presentence report and/or any previous sex offender or mental health evaluations to the treatment provider.

16. You must submit to a search of person, property, residence, vehicles, documents, businesses, computers [as defined in 18 U.S.C. 1030(e)(1)], and other electronic communications or data storage devices or media effects, at any time, by a probation officer with reasonable suspicion concerning a violation of a condition of probation or supervised release, or unlawful conduct by the person, in the lawful discharge of the officer's supervision functions. You must inform any other occupants that the premises may be subject to searches pursuant to this condition. Failure to submit to a search may be grounds for revocation of supervision.

17. You will not have any direct or indirect contact or communication with the victim or his or her family, or go near or enter the premises where the victim or his or her family resides, is employed, attends school or treatment, except under circumstances approved in advance and in writing by the probation officer.

AO 245B (Rev. 09/19)     Judgment in a Criminal Case
                         Sheet 5 – Special Conditions
                                                                            Judgment - Page 5 of 7

DEFENDANT: **KEVIN VIGIL**
CASE NUMBER: **1:18CR00739-001MV**

## SPECIAL CONDITIONS OF SUPERVISION

**You must not use or possess alcohol.**

**You must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic cannabinoids, synthetic cathinones, etc.) that impair your physical or mental functioning, whether or not intended for human consumption.**

**You must not possess, sell, offer for sale, transport, cause to be transported, cause to affect interstate commerce, import, or export any drug paraphernalia, as defined in 21 U.S.C. 863(d).**

**You must undergo a sex offense-specific assessment to determine the level of risk for sexual dangerousness, recidivism, and amenability to treatment and formulate treatment recommendations if treatment is necessary.  You may be required to pay all, or a portion of the cost of the assessment.**

**You shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer shall disclose the presentence report, any previous sex offender evaluations and/or other pertinent treatment records to the treatment provider.**

**If recommended in the sex offense-specific assessment, you must begin attending and participating in sex offender treatment consistent with the recommendations of the evaluation.  You must follow the rules and regulations of that program. The probation officer, in conjunction with the treatment provider, will supervise your participation in the program (location, modality, duration, intensity, etc.).  Furthermore, you must submit to clinical polygraph examinations, as directed by the probation officer and/or treatment provider. You may be required to pay a portion or all of the cost of the assessments and treatment.**

**You are prohibited from viewing or possessing any material that depicts sexually explicit conduct as defined in 18 U.S.C. 2256, including images, books, writings, drawings, video games, or videos depicting actual sexual intercourse.  This also includes computer or computer-generated images or pictures, whether made or produced by electronic, mechanical, or other means.  Should the sex offense-specific assessment determine this factor is not a risk, then this condition shall not be enforced.**

**You must not have direct contact with children under the age of 18 years without written approval of the treatment provider in conjunction with the probation officer.  If you do have any direct contact with any child you know or reasonably should know to be under the age of 18 years, including your own children, without the permission of the probation officer in conjunction with the treatment provider, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.**

**You are restricted from engaging in an occupation where you have access to children without prior approval of the probation officer.**

**You must not go to or remain within 100 feet of school yards, parks, playgrounds, arcades, or other places used primarily by children under the age of 18years old.**

**You must not volunteer for any activities in which you supervise children or adults with mental or physical disabilities.**

**You must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You may be required to pay all, or a portion, of the costs of the program.**

**You shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer may disclose the presentence report, any previous substance abuse evaluations and/or other pertinent treatment records to the treatment provider.**

**You must submit to substance abuse testing to determine if you have used a prohibited substance. Testing may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, an alcohol monitoring technology program, and/or any form of prohibited substance screening or testing. You must not attempt to obstruct or tamper with the testing methods.  You may be required to pay all, or a portion, of the costs of the testing.**

**The restriction on no possession of pornographic materials is restricted to pornographic materials relating to children.**

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 6 – Criminal Monetary Penalties                                    Judgment - Page 7 of 7

DEFENDANT: **KEVIN VIGIL**
CASE NUMBER: **1:18CR00739-001MV**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

☐    The Court hereby remits the defendant's Special Penalty Assessment; the fee is waived and no payment is required.

| Totals: | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---------|------------|-------------|------|------------------|-------------------|
|         | $100       | $0          | $0   | $                | $                 |

☐    The determination of the restitution is deferred until .  An *Amended Judgment in a Criminal Case* will be entered after such
      determination.
☐    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A    ☒    In full immediately; or

B    ☐    $ due immediately, balance due (see special instructions regarding payment of criminal monetary penalties).

**Special instructions regarding the payment of criminal monetary penalties: Criminal monetary penalties are to be made
payable by cashier's check, bank or postal money order to the U.S. District Court Clerk, 333 Lomas Blvd. NW, Albuquerque,
New Mexico 87102 unless otherwise noted by the court. Payments must include defendant's name, current address, case
number and type of payment.**

**Based on the defendant's lack of financial resources, the Court will not impose a fine. In lieu of all or a portion of the fine, the
Court considered alternative sanctions, such as community service, placement at a residential reentry center, and location
monitoring, and concludes the total combined sanction without a fine or alternative is sufficiently punitive.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is
due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of
Prisons' Inmate Financial Responsibility Program, are made to the clerk of court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order:  (1) assessment,  (2) restitution principal,  (3) restitution interest,  (4)  AVAA
assessment,  (5) fine principal,  (6) fine interest,  (7) community restitution,  (8) JVTA assessment,  (9) penalties, and  (10) costs,
including cost of prosecution and court costs.

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

# ATTACHMENT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

                                          Criminal No. 18-739-MV

v.

KEVIN VIGIL,

      Defendant.

## **ORDER ON MOTION IN LIMINE**

**THIS MATTER** comes before the Court on the government's Motion in Limine for the Admission of Excited Utterances and Present Sense Impression Statements.  Doc. 130.  The defense timely replied.  Doc. 160.  The Court heard arguments on this motion on July 31, 2019. Having reviewed the briefs, relevant law, and being otherwise fully informed, the Court will **GRANT** the motion.

## **BACKGROUND**

The government requests a pre-trial ruling to be able to admit A.W.'s statements, made to her mother on the way to Presbyterian Española Hospital, under Federal Rules of Evidence 803(1) (present sense impressions) and Rule 803(2) (excited utterances).  Doc. 130 at 1.  The government argues there is no violation of Mr. Vigil's right to confront the witness as the statements are not testimonial.  *Id.* at 7.

The government argues that A.W.'s statements to her mother on the way to the hospital are admissible as present sense impressions because "[t]he statements describe the abuse immediately after the child was in Defendant's bed."  Doc. 130 at 5.

The government also argues that A.W.'s statements to her mother on the way to the hospital

1

qualify as excited utterances because the statements meet all three requirements under Rule 803(2) and *Ledford*.   This exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event.   *Id.* (citing *United States v. Ledford*, 443 F.3d 702, 710 (10th Cir. 2005)).   The government first notes that a minor child being sexually abused by an adult would be a startling event.   *Id.* at 6 (citing *United States v. Farley*, 992 F.3d 1122, 1123 (10th Cir. 1993)).   Second, it argues A.W. was still under the stress of the event as evidenced by the short time lapse, her young age, the startling nature of the event, and she appeared—according to her mother—to be "crying and upset."   *Id.* at 7.   Third, the government states "there is a clear nexus between A.W.'s statements and the startling events."   *Id.*

Mr. Vigil opposes the motion.   Doc. 160.   He expects that the government intends to introduce the statements through the testimony of A.W.'s mother, Consuelo War, and objects to the admission of the statements because the individual offering the statements is unreliable.   *Id.* at 1.   Mr. Vigil argues that "C.W. has a long history reflective of her lack of honesty," including stealing her sister's tax refund, forging her sister's signature, shoplifting from Wal-Mart, and requesting A.W. to supply urine for Ms. War's drug testing.   *Id.* at 2.

Mr. Vigil additionally argues that the government has not met the second prong of the excited utterances exception: the statement was made while the declarant was under the stress of the event's excitement.   *Id.* at 3.   However, as noted, the government addressed this in their motion in limine: it states that the time lapse was brief between the event and the statement ("likely a matter of minutes"), she was very young at the time, and her mother reports that A.W. "was crying and upset."   Doc. 130 at 7.   Mr. Vigil, however, believes A.W. was not stressed because she allegedly said, "Goodbye, Uncle Kevin!" and also said goodbye to Mr. Vigil's daughter,

Tabatha, who A.W. hugged before she left "as if nothing had happened." Doc. 160 at 3. Mr. Vigil testified to this account at the hearing on July 31, 2019.

**LEGAL STANDARD**

The Federal Rules of Evidence define hearsay as an out of court statement that is offered to prove the truth of the matter asserted in the statement. FED. R. EVID. 801. Hearsay is generally inadmissible except as provided by federal statutes, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court. FED. R. EVID. 802. Hearsay bars a party from presenting its own statements, but a statement that is otherwise hearsay may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. *See United States v. Caraway*, 534 F.3d 1290, 1299 (10th Cir. 2008). Rule 803 of the Federal Rules of Evidence sets forth several exceptions to the rule against hearsay. FED. R. EVID. 803.

I.     Law Regarding Rule 803(1).

Rule 803(1) provides an exception to the rule against hearsay for "[a] statement describing an event or condition, made while or immediately after the declarant perceived it." FED. R. EVID. 803(1). "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." *United States v. DeLeon*, 287 F. Supp. 3d 1187, 1237 (D.N.M. 2018) (citing *United States v. Mejia–Valez*, 855 F. Supp. 607, 613 (E.D.N.Y. 1994)). "The present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures." *Id.* (citing *Brown v. Keane*, 355 F.3d 82, 89 (2d Cir. 2004)). Such statements are allowed because they are deemed especially

3

trustworthy, and it is believed that the contemporaneousness of the event and statement minimizes the likelihood of deliberate or conscious misrepresentation.  *Navarette v. California*, 572 U.S. 393, 399–400.

II.     Law Regarding Rule 803(2).

Federal Rule of Evidence 803(2) excludes from hearsay a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that caused it." FED. R. EVID. 803(2).   The exception is similarly allowed because it is believed that the circumstances "still[] the capacity for reflection and produce[] utterances free of conscious fabrication."  *United States v. Magnan*, 863 F.3d 1284, 1292 (10th Cir. 2017).

The Tenth Circuit set forth a district court's required analysis for whether a statement is admissible under the excited-utterance exception:

> The so-called excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event. [T]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance. Admissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself. There is no hard time limit that must be met under Rule 803; what is relevant is whether the declarant is still under the excitement of the startling event.

*United States v. Smith*, 606 F.3d 1270, 1279 (10th Cir. 2010) (internal citations and question marks omitted).   In determining what constitutes being "under the stress" of a situation, the Tenth Circuit has stated that the following are "[a]mong the more relevant factors" for the court to consider: "the amount of time between the event and the statement; the nature of the event; the subject matter of the statement; the age and condition of the declarant; the presence or absence of self-interest; and whether the statement was volunteered or in response to questioning."  *United States v. Pursley*, 577 F.3d 1204, 1220 (10th Cir. 2009).

## ANALYSIS

This Court concludes that A.W.'s statements to her mother on the way to Presbyterian Española Hospital are admissible as hearsay exceptions under Federal Rules of Evidence 803(1) (present sense impressions) and Rule 803(2) (excited utterances).   While the Court acknowledges Mr. Vigil's legitimate concern about the reliability of the witness offering the statements, such an issue can be adequately addressed on cross-examination.   The reliability of the statements is based on the *declarant*'s ability to reflect and potentially fabricate the statements, not the reliability of the witness offering the statements.

A.W.'s statements meet the requirements to qualify as present sense impressions.   FED. R. EVID. 803(1).   First, A.W.'s statements to her mother described the actions allegedly taken by Mr. Vigil while A.W. was in the bed with him.   Second, A.W. was the individual relaying what happened to her personally—she was the person who perceived the event described.   Finally, these statements were made in a time period that was "'substantially contemporaneous' with the event in question."   Ms. War allegedly took A.W. to the hospital immediately after her observations and, thus, A.W.'s statements on the way to the hospital were made shortly after experiencing the alleged event.

A.W.'s statements also meet the requirements under Rule 803(2) exception to hearsay for excited utterances.   First, A.W.'s alleged experience as a six-year-old being sexually assaulted by an adult certainly would qualify as a startling event.   *See Farley*, 992 F.3d 1122.   Second, A.W. appears to have made the statement while under the stress of the event's excitement.   Using the guidance set forth by *Pursley*, this Court finds that there was a short amount of time between the event and the statement, the nature of the event was startling, A.W. was only six years old at the time, and she appears to have made the statements to Ms. War without demonstrating any self-

interest.   As to A.W.'s condition at the time of the statement, although Mr. Vigil testified that

A.W. was calm when she left the home, A.W.'s mother observed that she was upset and crying at

the time she made the statements.   *Pursley*, 577 F.3d at 1220.   Additionally, as this is just one

factor to consider under the analysis, this Court finds that the evidence weighs in favor of finding

that she was still under the stress of the situation.   Finally, A.W.'s statements to Ms. War were

directly related to the event she had allegedly just experienced.

   **IT IS THEREFORE ORDERED** that the Court will **GRANT** the government's Motion

in Limine for the Admission of Excited Utterances and Present Sense Impression Statements,

assuming that the government establishes the foundation it has proffered as has been set forth

herein.   Doc. 130.


   DATED this 6th day of August, 2019.


   _____
   MARTHA VÁZQUEZ
   United States District Judge

6

# ATTACHMENT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

                                    Criminal No. 18-739-MV

    v.

KEVIN VIGIL,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

    **THIS MATTER** comes before the Court on the government's Motion for Pre-trial Determination of Indian Country Land Status.   Doc. 60.   Mr. Vigil timely responded.   Doc. 71. The government then filed a timely reply.   Doc. 89.   The Court heard arguments on this motion on July 29, 2019, at which time the parties entered a Stipulation Regarding Land Status.   The Court, having considered the Motion, relevant law, and being otherwise fully informed, finds that the motion will be **GRANTED**.

**BACKGROUND**

    In a criminal prosecution under 18 U.S.C. §§ 1152 or 1153, the Court determines its jurisdiction based on facts established by a preponderance of the evidence.   *See United States v. Bustillos*, 41 F.3d 931, 933 (10th Cir. 1994) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).   The Indictment charges Kevin Vigil with two counts, both of which involve a violation of 18 U.S.C. § 1152.   *See* Doc. 25 (Indictment) at 1, 2.

    In the Indian County Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153, Congress "conferred on the federal courts special criminal jurisdiction over offenses committed in Indian country."   *Cohen's Handbook of Federal Indian Law* § 9.01, at 236–37 (Neil

1

Jessup Newton et al. eds., 2012).   The crime must occur within "Indian country" in order for there

to be federal jurisdiction.   18 U.S.C. §§ 1152, 1153.   The statute provides that "[a]ny Indian who

commits against the person or property of another Indian or other person any of the following

offenses, . . . within the Indian country, shall be subject to the same law and penalties as all other

persons committing any of the above offenses. . . ."   18 U.S.C. § 1153(a).   According to § 1151,

Indian country is defined as follows:

> Except as otherwise provided in sections 1154 and 1156 of this title, the term
> "Indian country", as used in this chapter, means (a) all land within the limits of any
> Indian reservation under the jurisdiction of the United States Government,
> notwithstanding the issuance of any patent, and, including rights-of-way running
> through the reservation, (b) all dependent Indian communities within the borders of
> the United States whether within the original or subsequently acquired territory
> thereof, and whether within or without the limits of a state, and (c) all Indian
> allotments, the Indian titles to which have not been extinguished, including rights-
> of-way running through the same.

18 U.S.C. § 1151.

The government "moves the Court for a pre-trial determination that the land on which the

charged crimes in this case occurred" is "located within the exterior boundaries of the Ohkay

Owingeh Pueblo" and "therefore is Indian Country for purposes of federal criminal jurisdiction."

Doc. 60 at 1.   The location is:

> 1326B Camino Raphael, in Española, Rio Arriba County, New Mexico, mainly in
> Section 25, Township 21N, Range 8E, NMPM, within the San Juan Land Grant.

*Id.*

It is not disputed that the land falls within the exterior boundaries of the Ohkay Owingeh

Pueblo, a federally recognized Indian Tribe.   *Id.*; Doc. 71 at 1; Stipulation Regarding Land Status

¶ 1.   The parties further stipulate that, on July 12, 1935, title to the tract of land on which the

charged crimes are alleged was transferred to Antonio David Salazar and Ramona B. de Salazar

pursuant to the Pueblo Lands Act of 1924.   Doc. 71 at 1–2, 4; Stipulation ¶ 2.   The Salazars

2

were non-Indians.   *Id.*   The 1935 patent transferring the land validly conveyed the land at issue

to the Salazar family.   *See* Doc. 71-1, Ex. A; Stipulation ¶ 3.   At the time of the alleged crimes,

the land was privately held by non-Indians.   Stipulation ¶ 4.

The government outlines the evidence it is prepared to present to confirm the status of the

land.   *See id.* at 4–6 & Exs.   This includes an April 11, 2018 certification by the Ohkay

Owingeh's Natural Resource Director that the address "is located within the exterior boundaries

of the Ohkay Owingeh" Pueblo [Ex. 2], as well as Bureau of Indian Affairs maps [Exs. 1, 3]

showing the location of the address at issue in relation to the Pueblo boundaries, and the Federal

Register showing the tribe is federally recognized [Ex. 4].

Mr. Vigil argues that this Court lacks subject matter jurisdiction.   Doc. 71 at 1.   He

presents the 1935 Patent as Exhibit A, which states that it "shall have the effect only of a

relinquishment by the United States of America and the Indians of said Pueblo."   *Id.* at 2, Ex. A.

He notes that Exhibit F, the supplemental plat containing the tract of land conveyed to the Salazars,

states that it "represents the survey of certain tracts of land within the San Juan Pueblo Grant to

which the Indian title has been extinguished according to the findings of the Pueblo Lands Board."

*Id.* at 7, Ex. F.   In addition, Mr. Vigil submitted a letter from Thomas Aragon, the Planning and

Zoning Director of Rio Arriba County, stating that Antonio David Salazar and his wife "met the

requirements necessary under a federal land claim.   In doing so, he and his wife were awarded a

U.S. Patent for the land thereby extinguishing any tribal claim to the land."   *Id.* at 71-1 [Ex. E].

The defense thus requests that the case be dismissed as the Court must presume it lacks subject

matter jurisdiction.   *Id.* at 1.

In its reply, the government points out that the land at issue was transferred by patent issued

by the United States executive branch on July 12, 1935, but under the plain language of the 2005

3

amendments to the Pueblo Land Act, there are no exceptions for lands held privately by non-Indians unless extinguished by Congress—that is, all land within the exterior boundaries of the Pueblo constitute "Indian Country."   Doc. 89 at 2.

The language upon which the parties disagree is the clause "except as otherwise provided by Congress" found in the 2005 amendments to the 1924 Pueblo Land Act.   119 Pub. L. No. 109-133, 119 Stat. 2573.   Defense believes that the 2005 amendments to the Pueblo Land Act excludes from the grant of federal jurisdiction those lands formerly belonging to the Pueblos that were transferred to private ownership as a result of the 1924 Pueblo Land Act.   Doc. 71 at 7.   At the hearing, defense argued that this language is not throat clearing, as the government suggests. Transcript[1] at 13:15–23.   Rather, the rule against surplusage suggests that this language was intended to have the legal effect of covering the land for which "patents were issued to non-Indians through the process of the Pueblo Land Act."   Tr. at 13:23–14:1.

The government, meanwhile, disagrees with this interpretation and notes that the Pueblo Land Act was "focused on the narrow issue of quieting title of lands lying within the exterior boundaries of Pueblo lands."   Doc. 89 at 3.   Government notes also that it was the Executive, not Congress, that issued the land patent to the Salazars and the plain language of the 2005 amendments require an act of Congress to form the basis for an exception to federal jurisdiction. *Id.* (citing *St. Charles Inv. Co. v. Comm'r*, 232 F.3d 773, 776 (10th Cir. 2000) ("It is a general rule of statutory construction that if a statute specifies exceptions to its general application, other exceptions not explicitly mentioned are excluded.").   The government goes on to discuss the history of the 2005 amendments to the 1924 Pueblo Land Act and the goal to "avoid lawless enclaves within Pueblo Lands."   Doc. 89 at 5–7.

---

[1]  References to the transcript are to draft of the July 29, 2019 hearing.

# DISCUSSION

## I.  Legal Standard

The Court may determine that the offenses proffered by the United States are within the territorial boundaries of the Ohkay Owingeh Pueblo, and then leave to the jury the question of whether the offenses occurred in those locations.    *See, e.g.*, *United States v. Neha*, No. CR 04-1677 JB, 2006 WL 1305034, at *4 (D.N.M. April 19, 2006) ("While the Tenth Circuit, in *United States v. Roberts*, stated that district courts can find, as a matter of law, that a particular location is Indian Country, and then instruct the jury to determine factually whether the offense occurred there, the Tenth Circuit did not require courts to follow that procedure.").   The Court may take evidence on this issue outside of the presence of the jury and instruct the jury based upon its findings.   *See, e.g.*, *United States v. Tsosie*, No. CR 10–0773 JB, 2011 WL 2728346, at *1 ("While the Court usually hears the evidence at trial with the jury, there does not appear to be any problem with the Court hearing the evidence pretrial outside of the jury's presence and making the decision pretrial.").   Courts have accepted a variety of evidence to prove this jurisdictional fact, including oral testimony, aerial photographs, maps, and land titled records.   *See, e.g.*, *United States v. Atkinson*, 916 F. Supp. 969 (D.S.D. 1996) (aerial photography, oral testimony, and maps); Lamy, 521 F.3d at 1267–68 (oral testimony, aerial photography, maps).

As is relevant here, "Indian country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, *notwithstanding the issuance of any patent*, and, including rights-of-way running through the reservation."   18 U.S.C. § 1151(a) (emphasis added).   The Tenth Circuit has recognized Pueblo land as dependent Indian communities "entitled to the aid and protection of the federal government and subject to congressional control."   *United States v. Arrieta*, 436 F.3d 1246, 1249 (10th Cir. 2006).   The

5

District of New Mexico has confirmed that Indian land subject to the issuance of any patent is still Indian land if the property lies within the boundaries of the Indian reservation. *See United States v. Antonio*, No. 16-CR-1106-JB, 2017 WL 3149361 at *11 (D.N.M. June 5, 2017) (citing William C. Canby, American Indian Law § 7.B, at 140 (5th Ed. 2009)); *see also Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 356–57 (1962); *United States v. Webb*, 219 F.3d 1127, 1131 (9th Cir. 2000) (holding "if the property is within boundaries of the reservation, it is Indian country irrespective of whether it is now held by a non-Indian.").

When applying the definition of "Indian country" to criminal trials under the Major Crimes Act, the Tenth Circuit has held that as "a general matter, the trial court decides the jurisdictional status of a particular property or area and then leaves to the jury the factual determination of whether the alleged crime occurred at the site." *United States v. Roberts*, 185 F.3d 1125, 1139 (10th Cir. 1999). Thus, "a trial court also acts appropriately when it makes the jurisdictional ruling a particular tract of land or geographic area is Indian Country, and then instructs the jury to determine whether the alleged offense occurred there." *Id.*

"The party seeking to invoke the jurisdiction of the federal court must demonstrate that the case is within the court's jurisdiction." *Bustillos*, 31 F.3d at 933. "The facts supporting jurisdiction must be affirmatively alleged, and if challenged, the burden is on the party claiming that the court has subject matter jurisdiction." *Id.* (citing *McNutt*, 298 U.S. at 189). Therefore, in a criminal prosecution under 18 U.S.C. §§ 1152 or 1153, the United States has the burden to prove by a preponderance of the evidence that the land on which the crime is alleged to have occurred is Indian country under 18 U.S.C. § 1151. *McNutt*, 298 U.S. at 189.

Prior to the 2005 amendments to the 1924 Pueblo Land Act, the courts struggled with a checkerboard jurisdiction that made determining Indian country difficult. In *Seymour*, for

example, the petitioner alleged that his state conviction was void due to lack of jurisdiction, arguing that "the 'purported crime' of burglary for which he had been convicted was committed in 'Indian country'" and, therefore, was within the United States' exclusive jurisdiction.   368 U.S. at 352 (quoting 18 U.S.C. § 1151).   The government argued that the State retained jurisdiction over the matter, because "the particular parcel of land upon which this burglary was committed is held under a patent in fee by a non-Indian."   *Id.* at 357.   The Supreme Court acknowledged that, at one time, the State of Washington's contention "had the support of distinguished commentators on Indian Law," but the Supreme Court concluded that "the issue has since been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151." *Id.*   Accordingly, "if the property is within boundaries of the reservation, it is Indian country irrespective of whether it is now held by a non-Indian."   *Webb*, 219 F.3d at 1131 (citing 18 U.S.C. § 1151(a)).

After *Seymour*, "the mere opening of a reservation for non-Indian settlement" does not remove the lands that non-Indians own in fee simple from Indian country under 18 U.S.C. § 1151(a); however, "a congressional decision to abandon the reservation status of those lands does." *United States v. Antonio*, No. CR 16-1106-JB, 2017 WL 3149361, at *12 (D.N.M. June 5, 2017), *appeal docketed*, No. 18-2118 (10th Cir. Feb. 19, 2019) (citing *American Indian Law* § 7.B, at 141).   "If Congress clearly acts to disestablish or diminish reservation land, then the land is 'outside the reservation boundary, and therefore outside of Indian country under 18 U.S.C. § 1151(a).'"   *Id.* (citing *United States v. Webb*, 219 F.3d at 1131).

The Supreme Court has held that Congress has: (i) the power to recognize "dependent tribes requiring the guardianship and protection of the United States;" (ii) the exclusive power "to determine for itself when the guardianship which has been maintained over [protected Indian

communities] shall cease;" and (iii) the power "to prohibit the introduction of liquor into . . . the

lands of the Pueblos," without unlawfully encroaching upon New Mexico's traditional police

power. *See United States v. Sandoval*, 231 U.S. 28, 48–49 (1913) ("Being a legitimate exercise

of that power, the legislation in question does not encroach upon the police power of the state, or

disturb the principle of equality among the states."). As Mr. Vigil notes, "Congressional intent to

extinguish Indian title must be 'plain and unambiguous.'" Doc. 71 at 6 (citing *United States v.*

*Santa Fe Pacific R. Co.*, 314 U.S. 339, 346 (1941)). Accordingly, the Supreme Court determined

that the Pueblo lands were Indian country, subject to federal jurisdiction, even where Pueblo lands

were not formally designated as reservations, unless explicitly excepted by Congress. *Sandoval*,

231 U.S. at 48–49.

On December 20, 2005, Congress amended the Pueblo Lands Act, 43 Stat. 636 (1924) in

order to clarify criminal jurisdiction on Pueblo lands. *See* Indian Pueblo Land Act Amendments

of 2005, Pub. L. No. 109-133, 119 Stat. 2573 (Dec. 20, 2015), *codified at* 25 U.S.C. § 331 Note.

The Amendment provides:

> **SEC. 20. Criminal Jurisdiction**.
> (a) IN GENERAL. Except as otherwise provided by Congress, jurisdiction over
>     offenses committed anywhere within the exterior boundaries of any grant from
>     a prior sovereign, as confirmed by Congress or the Court of Private Land
>     Claims to a Pueblo Indian tribe of New Mexico, shall be as provided in this
>     section.
> (b) JURISDICTION OF THE PUEBLO. The Pueblo has jurisdiction, as an act of the
>     Pueblos' inherent power as an Indian tribe, over any offense committed by a
>     member of the Pueblo or an Indian as defined in title 25, sections 1301(2) and
>     1301(4), or by any other Indian-owned entity.
> (c) JURISDICTION OF THE UNITED STATES. The United States has jurisdiction over
>     any offense described in chapter 53 of title 18, United States Code, committed
>     by or against an Indian as defined in title 25, sections 1301(2) and 1301(4) or
>     any Indian-owned entity, or that involves any Indian property or interest.
> (d) JURISDICTION OF THE STATE OF NEW MEXICO. The State of New Mexico shall
>     have jurisdiction over any offense committed by a person who is not a member
>     of a Pueblo or an Indian as defined in title 25, sections 1301(2) and 1301(4),
>     which offense is not subject to the jurisdiction of the United States.

25 U.S.C. § 331 Note.   Congress thus provided the test by which Courts are to determine whether

it has jurisdiction over alleged violations of 18 U.S.C. §§ 1152 and 1153 on Pueblo land.   The test

is clear: if the charging document alleges a violation of either of these statutes, and the violation

occurs "anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed

by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico," then a

federal court has jurisdiction over the matter.   25 U.S.C. § 331 Note; *see also Hydro Res., Inc. v.*

*U.S. E.P.A.*, 608 F.3d 1131 (10th Cir. 2010) (en banc) (quoting 25 U.S.C. § 331 Note).   The State

of New Mexico has similarly held that "[t]he privately-held fee lands within the exterior

boundaries of both Taos and Pojoaque Pueblos . . . remain Indian country, and the State does not

have jurisdiction to prosecute the alleged crimes occurring there."   *State v. Romero*, 2006-NMSC-

039, ¶ 26, 142 P.3d at 896.

Where Congress *has* extinguished Indian rights to land, the Tenth Circuit has recognized

that federal criminal jurisdiction will no longer exist.   *See Hackford v. Utah*, 845 F.3d 1325 (10th

Cir. 2017), *cert. denied*, 138 S.Ct. 206 (2017).   In *Hackford*, the Tenth Circuit concluded that the

criminal allegations committed by an Indian did *not* take place in tribal land as Congress had, in

1910, expressly extinguished Indian interest in the land and had set it aside for use as a reservoir.

*Id.* at 1329.   The land was thereby removed from the reservation and it no long maintained Indian

country status.   *Id.*

Using similar logic, the Tenth Circuit reached an opposite conclusion in *Magnan v.*

*Trammell*: the land where the alleged crimes occurred *was* "Indian country" because one step

required to extinguish Indian title had not been completed.   719 F.3d 1159 (10th Cir. 2013).   In

a 1945 law, Congress had set forth the following requirement for extinguishment of federal

restrictions on what had been Indian land: approval of the Secretary of the Interior in order to

effectuate a conveyance to the Housing Authority.  *Id.* at 1172.   Meeting this requirement would have removed the Indian status of the land at issue, but the requirement was not satisfied.  *Id.* Therefore, the Tenth Circuit concluded that, because the land was not conveyed to the Housing Authority, it remained "Indian country" at the time of the offense and the United States maintained criminal jurisdiction over the land.  *Id.* at 1176, n.8.

## II.   Analysis

In light of the Indian Pueblo Land Act Amendments of 2005, the jurisdictional inquiry is whether the instant offense occurred "anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico."   25 U.S.C. § 331 Note.   Congress' intent in enacting the Amendments of 2005 was "to clarify the uncertainty and potential law enforcement problems" on the New Mexico Pueblos' lands that had become such a problem that the territories were regularly referred to as having "checkerboard" jurisdiction.   S. REP. 108-406, at 3, n.1 (2004).

Here, the parties do not dispute that the land at issue—1326 B Camino Raphael (also known as Calle Raphael)—falls within the exterior boundaries of the Ohkay Owingeh Pueblo.   Although the 1935 patent passed the land to the Salazars, who are non-Indians, the definition of "Indian country," codified in 18 U.S.C. § 1151 is clear that the land remains "Indian country" notwithstanding the issuance of any patents.   Though Mr. Vigil cites to *Hackford* and *Magnan*, the Court does not believe these cases support his position that the land at issue here is not Indian country.   Here, the 1935 patent was not effectuated by Congress as would be necessary to except the land's status as "Indian country."   *See Hackford*, 845 F.3d at 1330.   Additionally, as government notes, these cases do not address the 1924 Pueblo Land Act and subsequent amendments.

10

Further, as was the intent of Congress in the passing of the 2005 amendments to the Pueblo

Land Act to avoid checkboard jurisdiction, the "United States has jurisdiction over any offense

described in chapter 53 of title 18, United States Code, committed by or against an Indian as

defined in title 25, sections 1301(2) and 1301(4) or any Indian-owned entity, or that involves any

Indian property or interest."   These amendments clarified that federal jurisdiction extends over all

Pueblo lands, including those privately held.

## CONCLUSION

The Court concludes that is has federal criminal jurisdiction in this matter.   The land at

issue in the instant offense is located within the exterior boundaries of the Ohkay Owingeh Pueblo,

San Juan Land Grant, as the boundaries were confirmed by Congress in 1858.   Though the land

was privately held at the time of the instant offense, the patent was not issued by Congress and the

land has remained "Indian country."

**IT IS THEREFORE ORDERED** that the Court will **GRANT** the government's Motion

for Pre-trial Determination of Indian Country Land Status.   Doc. 60.

DATED this 16th day of August, 2019.

_____
MARTHA VÁZQUEZ
United States District Judge

11