# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

_____

### NO. 20-2160

_____

**UNITED STATES OF AMERICA,**

        **Plaintiff/Appellee,**

  **vs.**

**KEVIN VIGIL,**

        **Defendant/Appellant.**

_____

**Appeal from the United States District Court
For the District of New Mexico
District Court No. 18-cr-739 MV
Hon. Martha Vázquez, United States District Judge**
_____

### APPELLEE'S ANSWER BRIEF – NO ATTACHMENTS
_____

### ORAL ARGUMENT IS NOT REQUESTED

        **FRED J. FEDERICI**
        Acting United States Attorney

        **ALLISON C. JAROS**
        Assistant U.S. Attorney
        Post Office Box 607
        Albuquerque, NM  87103
        (505) 346-7274
        Attorneys for Appellee

**May 2021**

## **RULE 26.1 DISCLOSURE**

The government is not aware of any organizational victims to the criminal activity charged in this case.

# TABLE OF CONTENTS

**PAGE**

TABLE OF CASES AND OTHER AUTHORITIES............................................ iv

PRIOR OR RELATED APPEALS.................................................... vi

ISSUES PRESENTED FOR REVIEW .............................................. 1

STATEMENT OF THE CASE AND THE FACTS............................................ 1

I.      The assault ........................................................... 1

II.     The SANE................................................................ 5

III.    The DNA testing ....................................................... 7

IV.     The forensic interview ................................................ 9

V.      The government's pretrial motions to admit A.W.'s out-of-court
        statements ............................................................ 10

VI.     The government's motion for a pretrial determination of Indian
        Country land status ................................................... 14

VII.    The trial testimony and the jury verdict .............................. 15

SUMMARY OF THE ARGUMENT ................................................ 16

ARGUMENT ................................................................... 18

I.      The district court did not abuse its discretion or plainly err
        when it admitted A.W.'s statements to her mother as present
        sense impressions and excited utterances............................... 18

        A.      Standard of review....................................... 18

B.    Argument......................................................................... 19

         *1.    Vigil's argument regarding the contemporaneity of
             A.W.'s statements to the assault has been forfeited
             and is subject to plain error review* ................................... 19

         *2.    Vigil's factual disagreements with the district court's
             ruling cannot constitute plain error* .................................... 23

         *3.    The district court correctly concluded that A.W.'s
             statements to her mother were made "shortly" after
             Vigil assaulted A.W. in his bed* .......................................... 25

         *4.    Even if the district court did err, Vigil has not shown
             that vacating the jury verdict and remanding for a new
             trial would advance the fairness, integrity, or public
             reputation of the courts* ....................................................... 31

         *5.    The district court did not abuse its discretion when it
             admitted A.W.'s statements to Consuelo as excited
             utterances* .......................................................................... 33

II.    The district court possessed jurisdiction over the offense ..................... 39

CONCLUSION AND STATEMENT CONCERNING ORAL ARGUMENT ... 40

CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION ...................... 42

# TABLE OF CASES AND OTHER AUTHORITIES

## TABLE OF CASES

**PAGE**

*United States v. Alcorta,*
   853 F.3d 1123 (10th Cir. 2017) ..................................................... 26

*United States v. Antonio,*
   936 F.3d 1117 (10th Cir. 2019) ..................................................... 39

*United States v. Barletta,*
   652 F.2d 218 (1st Cir. 1981) ........................................................ 32

*United States v. Castorena-Jaime,*
   285 F.3d 916 (10th Cir. 2002) ...................................................... 25

*United States v. Courtney,*
   816 F.3d 681 (10th Cir. 2016) ...................................................... 19

*United States v. Cruz,*
   156 F.3d 22 (1st Cir. 1998) .......................................................... 34

*United States v. Durham,*
   902 F.3d 1180 (10th Cir. 2018) ..................................................... 18

*United States v. Farley,*
   992 F.2d 1122 (10th Cir. 1993) ......................................... 35, 36, 38

*United States v. Harrison,*
   743 F.3d 760 (10th Cir. 2014) ...................................................... 21

*United States v. Ledford,*
   443 F.3d 702 (10th Cir. 2005) ................................................ 33, 34

*United States v. Leffler,*
   942 F.3d 1192 (10th Cir. 2019) ..................................................... 20

*United States v. Lossiah,*
  129 F. App'x 434 (10th Cir. 2005) (unpublished) ......................................... 37

*United States v. Lovato,*
  950 F.3d 1337 (10th Cir. 2020) ............................................................. 23, 24

*United States v. Olano,*
  507 U.S. 725 (1993) ............................................................................... 31

*United States v. Porter,*
  881 F.2d 878 (10th Cir. 1989) .................................................................. 18

*United States v. Pursley,*
  577 F.3d 1204 (10th Cir. 2009) .................................................. 34, 36, 37, 38

*United States v. Smalls,*
  752 F.3d 1227 (10th Cir. 2014) ........................................................ 18, 19, 28

*United States v. Smith,*
  606 F.3d 1270 (10th Cir. 2010) ........................................................ 34, 35, 38

*United States v. Tisdale,*
  248 F.3d 964 (10th Cir. 2001) ................................................................ 21, 25

*United States v. Tocco,*
  135 F.3d 116 (2nd Cir. 1998) .................................................................... 35

*United States v. Williamson,*
  53 F.3d 1500 (10th Cir. 1995) ................................................................... 24

*United States v. Winder,*
  557 F.3d 1129 (10th Cir. 2009) ............................................................. 20, 21

*United States v. Wright,*
  848 F.3d 1274 (10th Cir. 2017) ................................................................. 20

# TABLE OF AUTHORITIES

**PAGE**

Statutes

18 U.S.C. §§ 2241(c) and 2246(2)(A) ................................................................ 30

Rules

Fed. R. Evid. 103(a)(1) ........................................................... 23

Fed. R. Evid. 104(a) ............................................................ 26

Fed. R. Evid. 803(1) ............................................................. 23

Fed. R. Evid. 803(2) ........................................................... 33

Fed. R. Evid. 1101(d)(1) ....................................................... 26

# PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## ISSUES PRESENTED FOR REVIEW

I.    Whether the district court abused its discretion when it admitted, as present sense impressions and excited utterances, statements that A.W., a six-year-old child, made to her mother while crying in the car on the way to the hospital to seek treatment for a sexual assault.

II.   Whether the district court possessed jurisdiction over the offense.

## STATEMENT OF THE CASE AND THE FACTS

## I.    The assault

On the evening of February 2, 2018, Defendant-Appellant Kevin Vigil invited his close friends, Tommy War, Sr. and Consuelo War, to "come over" and drink with him at his house in Española, New Mexico.  3 ROA 905, 909, 912, 942.[1]  Tommy and Consuelo were a divorced couple that Vigil had known for years.  *Id.* at 395-96, 909-11.  In preparation for his friends' arrival, Vigil purchased beer and shots.  *Id.* at 912.  The trio then spent the night at Vigil's home talking and drinking.  *Id.* at 912-13.  Tommy and Consuelo slept over in Vigil's living room.  *Id.* at 399, 914.

The next afternoon Consuelo, Tommy, and Vigil traveled together to the home of Shanice War, Tommy and Consuelo's adult daughter, to pick up A.W., Tommy and Consuelo's six-year-old daughter.  *Id.* at 399, 446, 442, 915-16.

---

[1] Citations to "__ ROA" refer to the cited volume of the record on appeal. References to Vigil's brief are abbreviated "Def. Br."

1

While her parents were partying with Vigil on Friday night, A.W. had spent the night with her sister Shanice. *Id.* at 443. During the time she was at Shanice's house, A.W. was not complaining of any pain. *Id.* at 444. Nor was she scratching her privates or showing signs of vaginal irritation, discomfort, or injury. *Id.* at 444, 446. By all accounts, A.W. was happy, cheerful and in good physical health when she left Shanice's care on Saturday afternoon.[2] *Id.* at 399, 447.

 After they collected A.W., Consuelo, Tommy, and Vigil purchased Taco Bell for dinner and returned to Vigil's home. *Id.* at 399, 916. As they had the night before, Consuelo, Tommy, and Vigil were drinking beers and shots. *Id.* at 400, 437, 916-17.[3]

According to Consuelo, Vigil went to his bedroom and went to bed around 9:30 p.m. *Id.* at 400. Approximately thirty minutes later, at 10:00 p.m., A.W. joined Vigil in the bedroom to sleep. *Id.* at 401. From 10:00 p.m.

---

[2] Vigil points out that A.W. had suffered from vaginal irritation and inner thigh rashes on various occasions between 2015 and 2017. Def. Br. 10-12. None of A.W.'s family members, however, observed signs that A.W. was suffering such irritation in the month prior to the offense. 3 ROA 399, 444-46, 812, 822.

[3] Vigil testified that Consuelo and Tommy also smoked cocaine at his house that night. *Id.* at 925. Although she admitted to abusing cocaine around the time of the offense and although she acknowledged there were drugs in Vigil's house that night, Consuelo denied using cocaine on the night of the offense. *Id.* at 402, 424.

until about 2:10 a.m., Vigil and A.W. remained alone in Vigil's bedroom, with a few exceptions. *Id.* at 401-03.

Specifically, Consuelo reported that she twice looked into the bedroom to check on A.W. and Vigil after they went to sleep. *Id.* at 401-02; 1 ROA 219. Consuelo estimated that the first check-in occurred about thirty minutes after A.W. went to bed and the second check-in occurred another thirty minutes after that. 1 ROA 219. Both times A.W. and Vigil appeared to be asleep as best Consuelo could tell. 3 ROA 401-402; 1 ROA 219.

At approximately 11:30 p.m., Vigil's daughter, Tabatha, arrived at the home to clean. 3 ROA 402.

Then, at 1:15 a.m., A.W. woke up, exited Vigil's room, and sought out her parents in the kitchen. 1 ROA 21, 219. After a ten-minute delay, Vigil joined A.W. in the kitchen with Consuelo and Tommy. *Id.* Around 2:00 a.m., A.W. told her parents she was getting tired and returned to Vigil's room. *Id.* Once again, Vigil followed A.W. after five to ten minutes. *Id.*

Vigil and A.W. remained alone in his bedroom for around ten to fifteen minutes, before Consuelo became tired and joined them. 1 ROA 21. When Consuelo entered the bedroom, Vigil and A.W. were lying under the blankets. *Id.* at 219. Consuelo got into the left side of the bed, so that A.W. was lying between her and Vigil. *Id.* Three minutes later, Consuelo heard and felt "a lot of movement." 1 ROA 220; 3 ROA 406, 428. Immediately thereafter,

3

Consuelo heard A.W. gasp like she was in pain.  3 ROA 406.  As Consuelo

described it, the gasp "was the kind of gasp when you are gasping for air like

a gasping kind of pain.  1 ROA 220.

Responding to this sound, Consuelo reached out and felt that A.W.'s

sweatpants and underwear had been pulled down.  Consuelo also felt Vigil's

erect penis outside of his shorts.  1 ROA 220; 3 ROA 406.

Consuelo immediately jumped out of bed and turned on the lights,

whereupon she saw Vigil pulling up his underwear.  Consuelo grabbed A.W.

and told her to get ready to leave.  1 ROA 220; 3 ROA 406.  Consuelo also

confronted Vigil, but he acted like nothing had happened.  1 ROA 220; 3 ROA

406-07.

Consuelo left the bedroom, put on her shoes, announced to Tommy that

they were leaving, and took A.W. to the car.  1 ROA 220; 3 ROA 407.  Tommy

came with them.  When they got into the car, A.W. was "scared, shocked,

crying, and in pain."  3 ROA 407.  The family drove directly to Española

Hospital.  *Id.*

During this drive, A.W. told her mother that her "cookie," which is how

A.W. refers to her vagina, was hurting.  1 ROA 208; 3 ROA 407.  A.W.

explained that Vigil had put his fingers into her cookie and that he had also

put his "pee-pee" into her butt.  1 ROA 208, 220; 3 ROA 407.  A.W. told her

mother that she told Vigil to stop, but he would not.  *Id.*  Consuelo later

4

summarized these statements for the Sexual Assault Nurse Examiner as follows: "A. told me, when we were taking her to the hospital, that 'he tried to put his PeePee in my butt and he also put his fingers into my cookie and over and over.'"  1 ROA 220.

Consuelo and Tommy arrived at Española Hospital with A.W. at 2:38 a.m. in the morning.  3 ROA 408.  After a wait, they were referred to a second hospital in Santa Fe, New Mexico to obtain a sexual assault nurse examination, commonly referred to as a SANE.  *Id.* at 409, 411.

## II.    <u>The SANE</u>

Between roughly 5:24 a.m. and 11:12 a.m., a trained Sexual Assault Nurse Examiner, Corine Luna, evaluated A.W. for injuries or other evidence of sexual assault.  1 ROA 34-37, 22, 231.

Nurse Luna could see that A.W. was in distress.  1 ROA 218, 222; 3 ROA 475.  When Nurse Luna spoke with her, A.W. was grimacing.  3 ROA 475.  Nurse Luna asked A.W. to tell her what had happened that morning with Vigil.  1 ROA 218.  A.W. told Nurse Luna that Vigil "touched [her] private parts."  *Id.*  Nurse Luna asked what Vigil touched A.W.'s private parts with, and A.W. responded, "His fingers and his private part."  *Id.*  With the help of an anatomical drawing, A.W. explained that Vigil put his penis into her butt and that it hurt.  *Id.*  A.W. also indicated that Vigil used his fingers.  *Id.* at 218-19.  Nurse Luna asked A.W. if she said anything to Vigil

5

during the assault. *Id.* at 219. A.W. responded, "I told him to stop! But he wouldn't. I kept telling him to stop cuz it was hurting and he said to be quiet and he kept doing it. I kept trying to get his hand out but he kept doing it." *Id.*

When making these statements, A.W. never looked to Consuelo for answers. *Id.* at 145, 477. Nor did Consuelo attempt to talk over or respond to questions for A.W. *Id.*

During the subsequent physical evaluation, A.W. was unable to stay still; she was lifting her bottom off the exam table. 3 ROA 486. She was screaming, "It hurts. It hurts. It hurts. Stop. Stop. Stop." *Id.* These cries continued even when Nurse Luna was not touching A.W. or was only touching her "very gently." *Id.*

Nurse Luna's evaluation revealed multiple injuries to A.W.'s genitalia that were consistent with "friction, rubbing, and rough digital and possible penile rubbing and attempted penetration." 1 ROA 227. For example, the skin between A.W.'s labia majora and vaginal vestibule was abraded, beefy red, raw, and weeping. 1 ROA 226-27; 3 ROA 509. A.W.'s hymen and surrounding tissue were bruised and covered "throughout" in petechiae (spots caused by bleeding under the skin). 1 ROA 227. There was a small laceration to A.W.'s hymenal band and a tear near the base of her posterior fourchette that appeared to have been caused by a fingernail. *Id.* Finally,

Nurse Luna observed abrasions and redness around A.W.'s anal entrance. *Id.*

Nurse Luna explained that these injuries were "acute," meaning that the injuries were "fresh, now, not old, and not healed." 3 ROA 152, 514-15. In Nurse Luna's expert opinion, these injuries could not be explained by poor hygiene. *Id.* at 515.

In addition to the injuries, Nurse Luna noted that there was a "small to moderate amount of clear fluid" in A.W.'s vaginal vault. 1 ROA 227. To preserve the draining of this and any other fluids for later testing, Nurse Luna directed Consuelo to collect the next pair of underwear, a new pair of yellow underwear, that A.W. put on after the SANE. 3 ROA 419, 420, 513-14. Consuelo followed these instructions. *Id.* at 415-16, 419.

## III. __The DNA testing__

On February 8, 2018, Federal Bureau of Investigation ("FBI") Special Agent Russel Romero submitted the Sexual Assault Evidence Kit, Vigil's known buccal swabs, A.W.'s clothing, and other evidence to the New Mexico Department of Public Safety Forensic Laboratory for DNA testing. 1 ROA 25. Some of these items were later sent to a private lab, DNA Labs International, for more advanced testing. 3 ROA 699, 707.

During this battery of tests, the inner crotch of the purple underwear A.W. was wearing during the offense and the inner crotch of the yellow

underwear that A.W. wore home from the SANE both tested presumptively positive for saliva.  1 ROA 233; 3 ROA 579, 627, 632-33.

The conventional DNA testing revealed DNA matching Vigil's DNA on (1) A.W.'s mons pubis/outer labia majora swab, (2) one of the miscellaneous swabs from either A.W.'s breast or lips, and (3) the crotch of the purple underwear.  1 ROA 234; 3 ROA 162-63, 641-42, 713-14.

More sensitive Y-STR DNA testing, which focuses on the male chromosome, located male DNA consistent with Vigil's DNA on various items, including (1) A.W.'s vaginal swabs, (2) A.W.'s anal swabs, and (3) the crotch of the yellow underwear A.W. wore home from the SANE.[4]  1 ROA 234-35; 3 ROA 579, 621-22, 642.

A handful of the items, including the vaginal swabs and the anal swabs, also had detectable amounts of male DNA from additional, unknown contributors.  1 ROA 235; 3 ROA 634, 688-89.  None of the DNA from the unknown men, however, was present in sufficient proportions or quantities on the vaginal or anal swabs to compare to a known sample.  3 ROA 688-89, 708-12, 727.  Notably, on the two swabs where there was a major male

---

[4] The male DNA profile that matched Vigil's DNA has been observed in 1 in 80 individuals in the Native American population and 1 in 130 individuals in the Hispanic population.  1 ROA 235.  In other words, there was a 1.25% chance of selecting a random man in the Native community with this DNA and a 0.769% chance of selecting a random man in the Hispanic community with this DNA.

contributor, that contributor was Vigil.  *Id.* at 634-35, 717-18.  For example, the second testing of the mons pubis and outer labia majora swab determined that 84% of the DNA on the sample belonged to A.W., 16% belonged to Vigil, and less than 1% belonged to an unknown contributor.  *Id.* at 717-18. Similarly, on the first testing of the vaginal swab, Vigil was identified as the major male contributor, while the minor male contributor was "present in such minute quantity" that the minor profile could not be compared to a known sample.  3 ROA 634-35, 688-89.  In short, the primary male contributor to the DNA found on A.W.'s body and clothing was Vigil or someone with a Y-chromosome matching Vigil's.

Given the number of items containing Vigil's DNA and the sizeable amount of his DNA on these samples, DNA Analyst Raman Sandhu-Kirmer concluded that the most plausible explanation for the presence of Vigil's DNA on A.W.'s person and clothing was direct contact.  *Id.* at 645, 697.

## IV.  **The forensic interview**

On February 7, 2018, FBI Child Forensic Interviewer ("CFI") Karen Blackwell interviewed A.W.  1 ROA 25.  To help open the conversation, CFI Blackwell asked A.W. to tell her about why she went to the doctor.  2 ROA 235.  A.W. explained that she was hurt at her "Uncle Kevin's" house and that

it was her "Uncle Kevin"[5] who hurt her.  *Id.* at 235, 239.  A.W. marked the vaginal area on a drawing of a child to show where she had been hurt. 1 ROA 25.

When asked to explain what happened, A.W. told CFI Blackwell that Vigil pulled down her pants while she was asleep and then "sticked" his finger in "it."  *Id.* at 240.  A.W. explained that "later on" her mom was sleeping with her when Vigil "pulled down his pants, and then he was licking his bottom parts, and me" and he "put it, like, right here in me."  *Id.* at 241-42.  This hurt A.W.  *Id.* at 243-44.  A.W. said that she "told him to stop, but he kept doing it."  *Id.* at 242.  At some point, A.W.'s mom "finally figured out" what was happening.  *Id.*  According to A.W., her mom "got mad" and they left to go to the doctor's.  *Id.* at 243.

A.W. told CFI Blackwell that this was the first time Vigil had touched her privates.  *Id.* at 247.

A.W. also confirmed that no one told her not to talk about what had happened and that no one had told her to keep any secrets.  *Id.* at 234-35.

## V.  **The government's pretrial motions to admit A.W.'s out-of-court statements.**

On July 12, 2019, the United States filed three separate motions in limine regarding A.W.'s out-of-court statements.  1 ROA 11.  First, the United

---

[5] "Uncle Kevin" is the name A.W. used to refer to Vigil.  3 ROA 401.

States moved to introduce the statements A.W. made to Consuelo in the car after the assault as excited utterances and present sense impressions. *Id.* at 207-14. Second, the United States moved to admit A.W.'s statements to Nurse Luna as statements for the purpose of medical diagnosis or treatment. *Id.* at 202-05. Third, the United States requested leave to introduce A.W.'s statements to CFI Blackwell for the purpose of rehabilitation under Rule 801(d)(1)(B)(ii), should that become appropriate. *Id.* at 193-96. The United States provided the district court with verbatim copies and detailed proffers of A.W.'s statements. *Id.* at 194, 202, 208, 218-20; 2 ROA 209-59.

Vigil opposed all three of the government's motions. *Id.* at 323, 326; 2 ROA 9. Regarding the motion to admit A.W.'s statements to Consuelo, Vigil raised two and only two objections. 1 ROA 326-29.

To begin, Vigil conceded that present sense impressions were typically admissible as an exception to the hearsay rule. Vigil contended, however, that the district court should not permit Consuelo to testify about A.W.'s alleged statements because Consuelo was not a credible witness and Vigil believed her account of what A.W. said to be a "complete fabrication." *Id.* at 327-28. In addition, Vigil maintained that the statements should not be admitted as excited utterances because the government had not shown that A.W. was under "any stress" when she made the statements. *Id.* at 328-29.

The district judge held three consecutive days of pretrial motion hearings, in which it heard argument on these and other motions. 3 ROA 69-70, 128-29, 296-97.

During these hearings, Vigil briefly testified that A.W. was "happy" when she left his house in the early morning hours of February 4, 2018. *Id.* at 112. Vigil claimed A.W. hugged both him and his daughter, Tabatha, before leaving. *Id.* at 112-13.

In response, the United States argued that Vigil's testimony was not consistent with what Consuelo saw. *Id.* at 115.

After hearing argument from government counsel about why A.W.'s statements to Consuelo constituted excited utterances and present sense impressions, the district judge previewed its thoughts about the dispute as follows:

> [O]rdinarily, of course, I'll wait for trial to make sure that you can establish the necessary factual predicate for the introduction of these statements. In this case, however, the defense response is that – it's an interesting response. It's – as we know, the linchpin for the admissibility of these out-of-court statements is that the requirement their – for either present sense impression or excited utterance is that they are reliable, because there's no time to fabricate. Their argument is that the Government has chosen to admit these statements through someone that they are claiming is not reliable, and, therefore, question the entire admissibility of these."

*Id.* at 105. The district court labeled this a "fascinating" question and encouraged the parties to conduct more research on the issue and report

12

back.  *Id.* at 109.  The parties orally responded to this request two days later,

with more argument and case law.  *Id.* at 343-46.  The district court took the

motion under advisement.  *Id.* at 346.

On August 6, 2018, the district court issued a written ruling granting

the government's motion to admit A.W.'s statements to Consuelo as excited

utterances and present sense impressions.  1 ROA 336-41.  In this ruling, the

district court rejected Vigil's argument that the credibility of the testifying

witness, Consuelo, posed a bar to the admissibility of A.W.'s statements.[6]  *Id.*

at 340.  The district court found that A.W.'s statements were admissible as

present sense impressions because Consuelo "took A.W. to the hospital

immediately after her observations, and thus, A.W.'s statements on the way

to the hospital were made shortly after experiencing the alleged event."  *Id.*

The district court also found that these statements constituted excited

utterances.  *Id.* at 340-41.  In reaching this conclusion, the court

acknowledged that Vigil claimed A.W. was calm when she left his home.  *Id.*

The district court, however, did not find this self-serving testimony

dispositive.  The district court emphasized that A.W. was a young child at the

time of the offense, she had undergone a startling event, and she was

reportedly crying and upset when she made the statements to her mother

---

[6] Vigil does not challenge this component of the district court's ruling on
appeal.

shortly after the assault. *Id.* Based on these facts, the district court concluded that "the evidence weigh[ed] in favor of finding that [A.W.] was still under the stress of the situation" when the statements were made. *Id.* at 341.

Prior to trial, Vigil did not move the district court to reconsider this decision or raise any challenge to the district court's factual findings regarding the "short" amount of time between the assault and A.W.'s statements to Consuelo. *Id.* at 13-15.

The district court denied the government's motion to admit A.W.'s statements to Nurse Luna, 2 ROA 163-64, and reserved ruling on the motion to admit A.W.'s statements to CFI Blackwell under Rule 801(d)(1)(B)(ii), 3 ROA 100.

## VI.  The government's motion for a pretrial determination of Indian Country land status

On April 24, 2019, the United States filed an opposed motion asking the court to make a pretrial determination that the home where the offense occurred was located in Indian Country for the purposes of federal criminal jurisdiction. 1 ROA 72. The parties subsequently entered a stipulation agreeing that the home was located within the exterior boundaries of Ohkay Owingeh Pueblo on a private tract of land owned by non-Indians. *Id.* at 343-44; 3 ROA 75; II Supp. ROA 1. The parties disagreed about whether private

14

claims located on Pueblo land legally qualified as "Indian Country." 1 ROA

343-45. After hearing argument, the district court issued a written decision

agreeing with the government that the court possessed jurisdiction over the

offense. *Id.* at 352.

## VII.  <u>The trial testimony and the jury verdict</u>

At Vigil's jury trial, Consuelo testified regarding the events of February

3rd and 4th of 2018. Consuelo confirmed that A.W. was scared, shocked,

crying, and in pain when they left Vigil's home in the early morning hours to

go to the hospital. 3 ROA 407. Consuelo denied that A.W. hugged Tabatha

or Vigil before leaving the house. *Id.* at 430.

Consuelo told the jury that after they got into the car A.W. said to her,

"Mamma, my cookie hurts and my butt hurts. Uncle Kevin put his fingers in

my cookie and his pee-pee in my butt twice. And I told him to stop and he

wouldn't." *Id.* at 407. Vigil did not raise any oral objection to this testimony

at trial. *Id.*

The United States presented evidence, as outlined above, regarding

A.W.'s physical injuries and the DNA on her body and clothing to corroborate

A.W.'s out-of-court statements and to demonstrate that Vigil sexually abused

A.W. in the early morning hours of February 4, 2018.

Vigil presented testimony from competing SANE and DNA experts, the

thrust of which is summarized in his opening brief. Def. Br. 15-16. Vigil also

took the stand and told the jury he had never assaulted A.W.  3 ROA 944.

Vigil called A.W.'s family a "family of liars."  *Id.* at 950.

The jury did not agree.  While the jury acquitted Vigil of penetrating

A.W.'s anus with his penis as charged in Count 1 of the indictment, the jury

returned a guilty verdict finding, beyond a reasonable doubt, that Vigil had

penetrated A.W.'s genital opening with his fingers on or about February 4,

2018, as charged in Count 2 of the indictment.  1 ROA 28-29, 381.

The district court sentenced Vigil to thirty years of incarceration.  *Id.* at

383.  Judgment was entered on October 30, 2020, *id.*, and Vigil timely filed

his notice of appeal on November 4, 2020, *id.* at 389.

## SUMMARY OF THE ARGUMENT

On appeal, Vigil challenges the district court's admission of A.W.'s out-

of-court statements to her mother as excited utterances and present sense

impressions.

First, Vigil argues that the sexual assault described in A.W.'s

statements could not have occurred on February 4, 2018 shortly before the

statements were made.  The evidence does not support this claim.  In the

days and weeks following the assault, A.W. consistently reported that Vigil

put his fingers in her vagina and put his penis in her butt on the night A.W.

went to the hospital.  A.W. affirmed that this was the first time Vigil touched

her privates.  A.W. further explained that the attack was interrupted by her

16

mother, Consuelo, who caught Vigil in bed with A.W. with his pants down and his penis out.  The testimony of Consuelo, A.W.'s physical injuries, and the DNA evidence corroborated A.W.'s reports.  Considering the entire record, it was not arbitrary, capricious, whimsical, or manifestly unreasonable for the district court to conclude that Vigil's assault of A.W. occurred on February 4, 2018.

Second, despite testimony that A.W., a six-year-old child, was crying, shocked, and distressed after the assault, Vigil contends that A.W. was not in a "state of excitement" when A.W. told her mother about the assault.  The district court correctly rejected this argument.  A.W.'s statements to Consuelo were made shortly after leaving Vigil's home, while A.W. was still suffering the pain of Vigil's sexual assault.  This Court has routinely admitted the statements of distressed assault victims in similar circumstances.

Vigil's final claim of error on appeal is that the district court lacked jurisdiction over the offense.  Vigil raises this claim to preserve the issue for the Supreme Court.  Vigil acknowledges that binding Tenth Circuit precedent dictates a finding that his home is located within Indian Country.

17

## ARGUMENT

I. **The district court did not abuse its discretion or plainly err when it admitted A.W.'s statements to her mother as present sense impressions and excited utterances.**

### A.    Standard of review

This Court reviews a district court's admission of evidence over a properly preserved hearsay objection for abuse of discretion considering the record as a whole.  *United States v. Smalls*, 752 F.3d 1227, 1236 (10th Cir. 2014).  Under this standard, the Court will not reverse a district court's evidentiary ruling "absent a distinct showing [that the ruling] was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment."  *Id.* (citation omitted).  A decision is not an abuse of discretion unless it is an "arbitrary, capricious, whimsical, or manifestly unreasonable judgment."  *United States v. Durham*, 902 F.3d 1180, 1230 (10th Cir. 2018).

Relevant here, this Court gives "heightened deference" to a trial judge's hearsay determinations because of the "fact-specific nature" of the inquiry.  *United States v. Porter*, 881 F.2d 878, 882 (10th Cir. 1989) ("The need for deference to a trial court ruling on a hearsay objection is particularly great because the determination of whether certain evidence is hearsay rests heavily upon the facts of a particular case.")

18

Where a hearsay objection is not properly preserved, the standard of review is even more burdensome for the appellant. *Smalls*, 752 F.3d at 1236. In such cases, this Court reviews for plain error and it is the appellant's burden to demonstrate that "(1) an error occurred; (2) the error is plain or obvious; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Courtney*, 816 F.3d 681, 683-84 (10th Cir. 2016).

**B.    Argument**

1.    *Vigil's argument regarding the contemporaneity of A.W.'s statements to the assault has been forfeited and is subject to plain error review.*

For the first time on appeal, Vigil maintains that A.W.'s statements to her mother were not admissible as present sense impressions because the evidence does not support a finding that A.W.'s statements to Consuelo were made "shortly" after A.W. experienced the assault described in the statements. Def. Br. 20, 25. This argument was never raised in the district court. It has been forfeited and is, therefore, subject to plain error review. *Smalls*, 752 F.3d at 1236.

In the district court, Vigil raised one and only one objection to the introduction of A.W.'s statements as present sense impressions: that Consuelo was not a credible witness. 1 ROA 326-28. As the district court recognized at the pretrial motions hearing, this objection did not involve a

19

dispute over the government's ability to establish the factual predicates required to introduce a present sense impression. *Id.*; 3 ROA 105. Instead, Vigil questioned the applicability of the hearsay exception to cases, such as this one, where the opposing party alleges that an untrustworthy testifying witness has fabricated the out-of-court statement. 1 ROA 327-28; 3 ROA 105, 116-17.

This challenge having failed and the jury having credited Consuelo's testimony, Vigil shifts his strategy on appeal to challenging the government's evidence regarding the timing of the assault.

Tenth Circuit precedent is clear that such substitutions in argument are reviewed on appeal for plain error. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) (when a party "changes to a new theory on appeal that falls under the same general category as an argument presented at trial," the new theory is not preserved); *see also United States v. Wright*, 848 F.3d 1274, 1281 (10th Cir. 2017) ("When a defendant objects at the district court but raises a different argument on appeal, we review for plain error."). The reason for this rule is that litigants have an obligation to alert the district court to alleged errors and allow the district court the "opportunity to correct its action in the first instance." *United States v. Winder*, 557 F.3d 1129, 1136 (10th Cir. 2009).

20

This obligation is not satisfied by blanket objections or general comments about the law. To preserve an issue for appeal, "an objection must be 'definite' enough to indicate to the district court 'the precise ground' for a party's complaint." *Id.*

Here, Vigil's objections directed the district judge's attention to different issues, specifically (1) whether an allegedly unreliable witness could testify about out-of-court statements and (2) whether A.W. was under stress or excitement when she made the statements. 1 ROA 326-29. Nothing in the trial record alerted the district court that there was also a factual dispute over the *timing* of the assault or the *contemporaneity* of the statements for the purposes of Federal Rule of Evidence 803(1).

In this regard, the present case is easily distinguishable from *United States v. Tisdale*, 248 F.3d 964 (10th Cir. 2001) and *United States v. Harrison*, 743 F.3d 760 (10th Cir. 2014). In both *Tisdale* and *Harrison*, while the objections were not detailed, the district court was aware of the specific nature of the defendant's disagreement with the court's ruling. *Tisdale*, 248 F.3d at 976 (although he failed to cite relevant legal authority, the defendant properly preserved his objection to consecutive sentences by asking that the district court run the federal sentence concurrent with the state sentence); *Harrison*, 743 F.3d at 763 (where the defendant personally informed the district judge that he disagreed with the probation officer's drug-quantity

calculations, a challenge to these calculations was preserved for appeal). The same cannot be said here; despite multiple opportunities, Vigil never challenged the district court's pretrial finding that A.W.'s statements were made immediately after the alleged assault.

In the absence of such an objection, Vigil asserts that the district court's own factual findings regarding the "short" time between the statements and the assault preserved a challenge to these findings for appeal. Def. Br. 22 (arguing that the district court's factual findings "demonstrate" that the court was "adequately alerted" to the need to determine when the assault occurred). This argument suffers from two fatal flaws.

First, the district court's findings regarding the timing of the assault were provisional. The district court only granted the government's motion to introduce A.W.'s statements, on the assumption that the government would establish at trial "the foundation" the government had proffered to the court in support of the motion. 1 ROA 341. One component of this proffer was that A.W.'s statements were made "immediately after" Vigil abused A.W. in his bed. *Id.* at 336, 340. If Vigil felt the government failed to present evidence satisfying this representation, Vigil could have raised an objection to Consuelo's testimony at trial. Vigil did not.

22

Second, even if the district court had not qualified its pretrial ruling, Vigil's argument flips the "specific ground" requirement of Federal Rule of Evidence 103(a)(1) on its head. District courts are not tasked with anticipating a defendant's unvoiced objections to their rulings. Not all rulings or factual findings are disputed. When a district court makes findings regarding the admissibility of evidence, as the district court did here, the onus is on the party opposing the introduction of such evidence to timely object to the findings and articulate the "specific ground" for the objection. Fed. R. Evid. 103(a)(1). Vigil having failed to lodge such an objection, the Court must review the district court's findings on this matter for plain error.

> 2. *Vigil's factual disagreements with the district court's ruling cannot constitute plain error.*

Federal Rule of Evidence 803(1) excludes from hearsay a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). This Court, like other courts, has refused to adopt a "per se" or "bright line" rule delineating how much time can pass between an event and a statement describing the event before the statement is no longer admissible under Rule 803(1). *United States v. Lovato*, 950 F.3d 1337, 1344 (10th Cir. 2020). When admitting present sense impressions, district courts must look to the facts of each case, keeping in mind that "precise contemporaneity" is not required. *Id.* A slight

lapse will not defeat admission of a statement under Rule 803(1) as long as there is substantial contemporaneity between the statement and event, with insufficient time for reflection. *Id.*

Applying this standard, the district court reasonably concluded that A.W.'s statements to Consuelo qualified as present sense impressions because A.W. made these statements "shortly" after the assault. 1 ROA 340. While the district court did not issue a finding on the exact length of time between the statements and the assault, the court noted that Consuelo took A.W. to the hospital "immediately after" catching Vigil in bed with A.W. with his erect penis out and that A.W.'s statements were made "on the way to the hospital." *Id.*

On appeal, Vigil does not find fault with the district court's legal analysis. Def. Br. 26-28. Instead, Vigil asserts that the evidence does not support the district court's "assumption" that the abuse A.W. described in her statements to Consuelo occurred while A.W. was in bed with Vigil during the night of February 3-4, 2018. *Id.* In other words, Vigil attacks the factual findings undergirding the court's ruling. *See United States v. Williamson*, 53 F.3d 1500, 1517 (10th Cir. 1995) ("[W]hile the ultimate issue of the admission or exclusion of evidence is reviewed for an abuse of discretion, preliminary foundational determinations . . . are factual findings, reviewed for clear error.").

24

Disputes over the facts cannot constitute plain error. *United States v. Tisdale*, 248 F.3d 964, 982 (10th Cir. 2001); *see also United States v. Castorena-Jaime*, 285 F.3d 916, 926-27 (10th Cir. 2002) ("This court has held repeatedly that factual disputes not brought to the attention of the court do not rise to the level of plain error."). Consistent with this case law, the Court should decline to consider Vigil's newly raised factual challenge on appeal.

3.     *The district court correctly concluded that A.W.'s statements to her mother were made "shortly" after Vigil assaulted A.W. in his bed.*

Even if this Court is inclined to consider a newly raised factual objection on appeal, Vigil cannot show that the district court plainly erred or abused its discretion when it concluded that A.W.'s statements to Consuelo described an assault that had occurred earlier on the same night the statements were made, while A.W. was in Vigil's bed.

As outlined in detail above, Consuelo caught Vigil in bed with A.W. with A.W.'s bottom exposed and Vigil's erect penis out of his pants. Unless the Court were to conclude that Consuelo was lying, the only reasonable conclusion to draw from this situation is that Vigil was sexually assaulting or attempting to sexually assault A.W. on February 4, 2018.

A.W.'s out-of-court statements confirm this interpretation of events. Prior to charges being filed, A.W. was twice interviewed by trained professionals — a SANE nurse and an FBI child forensic interviewer —

25

regarding the events of February 4, 2018.[7]  A.W. told both women that Vigil

had touched her genitalia or "private parts" with his finger that night.  A.W.

also told both women that Vigil put his "bottom part" or "pee-pee" in her and

that it hurt.  When talking with CFI Blackwell, A.W. explained that this

abuse went on for some time, with Vigil pulling down her pants while she

slept, touching her with his finger, and then pretending to be asleep when

she woke up.  2 ROA 240.  A.W. told CFI Blackwell that Vigil finally stopped

touching her "later" when her mother felt Vigil's "private," got mad at Vigil,

and took A.W. to the doctor.  *Id.* at 242, 244-45.

Finally, A.W. confirmed to CFI Blackwell that the night she went to the

"doctor" was the first time Vigil had touched her privates.  2 ROA 247.  From

these statements, it is clear that A.W. was describing the same assault when

she talked with her mother, Nurse Luna, and CFI Blackwell.  It is also clear

that this assault occurred on February 4, 2018, the night A.W. went to the

---

[7] While these statements were not admitted against Vigil at trial, they were
available to the district court when it made its pretrial rulings and they were
statements that the court could properly rely on when making the
preliminary factual determinations required by Federal Rules of Evidence
803(1) and 803(2).  *See United States v. Alcorta*, 853 F.3d 1123, 1140
n.2 (10th Cir. 2017).  Neither the district court nor this Court are bound by
the rules of evidence, including the hearsay rules, when determining whether
a statement is a present sense impression or an excited utterance.  Fed. R.
Evid. 104(a) and 1101(d)(1).

hospital, and not on some other earlier occasion as Vigil suggests in this appeal.

The physical evidence further supported the conclusion that Vigil sexually assaulted A.W. on February 4, 2018. When A.W. arrived at the hospital in the early morning hours on February 4, 2018, she was in significant pain and showed signs of trauma to her genitalia consistent with a recent sexual assault. 1 ROA 226-27; 3 ROA 152, 475, 509, 514-15. These injuries generally matched A.W.'s description of what had happened. A.W.'s genitalia were bruised and abraded, as one would expect when there has been friction and attempted penetration. 1 ROA 227. In addition, A.W. reported that Vigil had penetrated her vagina with his finger. *Id.* at 218. Consistent with this report, A.W. had a small tear near the base of her posterior fourchette that appeared to have been caused by a fingernail. *Id.* at 227.

The serological testing also matched A.W.'s statements. A.W. told CFI Blackwell that Vigil was "licking" his bottom part during the assault. 2 ROA 241. Subsequent testing of the crotch of A.W.'s underwear (both the underwear worn during the assault and the clean underwear A.W. wore home from the hospital) indicated the presumptive presence of saliva. 1 ROA 233.

Finally, DNA consistent with Vigil's DNA was found on the inside crotch of A.W.'s purple and yellow underwear, where saliva had been

27

indicated, as well as on various intimate parts of A.W.'s body, including her mons pubis, vagina, and anus. *Id.* at 233-35.

In arguing that the assault did not occur on February 4, 2018, Vigil discounts the combined strength of this evidence. He also overlooks the heightened deference due to the district court's hearsay findings. Vigil repeatedly asserts that the government has failed to prove when the assault could have occurred. Def. Br. 19, 28, 29. The burden at this stage, however, is not on the government. The question is whether, considering the record as a whole, the district court clearly, manifestly, or plainly erred when it concluded that the sexual assault A.W. described to Consuelo occurred in Vigil's bed on February 4, 2018. *See Smalls*, 752 F.3d at 1236.

Vigil's appeals to "common sense" and his unsupported assertions about the length of time and the amount of privacy it takes to sexually assault a child cannot satisfy this showing. For example, Vigil divides the night of February 3-4, 2018 into three segments and presumes that the assault must have occurred, if at all, in one discrete segment. Def. Br. 17-19. The evidence does not support this assumption. In her most detailed statement to CFI Blackwell, A.W. described a recurring attack, with Vigil touching her and then pretending to be asleep and only "later on," once Consuelo was sleeping with them, pulling down his pants, licking his bottom part, and putting it in A.W. 2 ROA 240-45. The most reasonable

interpretation of this statement is that Vigil began touching A.W. before Consuelo joined A.W. and Vigil in the bed and then continued touching A.W. in Consuelo's presence.  This accords with Consuelo's report to the FBI that A.W. and Vigil were alone in the bedroom together for several hours, including being alone for a ten to fifteen minute period after A.W. got up in the middle of the night and before Consuelo joined them in bed.  1 ROA 21, 219-20.  Vigil clearly had ample time alone to assault and touch A.W.  Even if this Court accepts Vigil's supposition that abuse did not start until after A.W. returned to Vigil's bed the second time, ten to fifteen minutes alone with a child is not so "brief" it would be arbitrary, capricious, whimsical, or manifestly unreasonable to conclude that Vigil had sufficient time, prior to Consuelo being present, to begin touching A.W.'s genitalia.

The Court should also reject Vigil's unsubstantiated[8] claim that it was impossible for him to twice "anally penetrate" A.W. in the roughly three-minute period when Consuelo was in bed with Vigil and A.W.  In making this argument, Vigil assumes what A.W. experienced as Vigil putting his penis into her "butt" involved the complete and prolonged insertion of his penis into A.W.'s anus.  This is pure speculation.

---

[8] Vigil does not cite any medical or expert evidence to support his assertions about how much time is required to sexually assault or penetrate a child. Def. Br. 26-28.  Contrary to his insinuation, this is not a matter of common knowledge or experience.

The image of "anal penetration," which Vigil repeatedly emphasizes, is not how A.W. described the assault. A.W.'s various statements describe the sexual assault from the perspective and in the words of a six-year-old child. A.W. never used the words "anus" or "anal opening" to specify where Vigil put his penis. 1 ROA 218-19; 2 ROA 209-58; 3 ROA 407. Instead, A.W. consistently reported that Vigil hurt her by putting his penis into her "butt." *Id.* Of note, A.W. never said how long this portion of the assault took, how far Vigil's penis was inserted, or even what she meant by the term "butt." *Id.* In the face of these ambiguities, Vigil points to absolutely no evidence that mandates reading A.W.'s statements to denote protracted anal penetration.

Such a reading stands in tension with the sexual assault statutes. The law instructs that any penetration "however slight" of a victim's anus rises to the level of a serious violation. 18 U.S.C. §§ 2241(c) and 2246(2)(A). As these statutes recognize, what a six-year-old child may experience as a horrendous and painful invasion into her body does not require anywhere near full penetration. Even a tiny incursion is too much.

Here, the record contains ample evidence to corroborate A.W.'s report that the assault involved contact between Vigil's penis and A.W.'s anus, which A.W. experienced as penetration of her "butt." Immediately before Consuelo felt Vigil with his penis out of his pants and A.W.'s bottom exposed, Consuelo heard A.W. gasp in pain, suggesting a contemporaneous attack on

A.W.'s body.  1 ROA 220.  Within hours, Nurse Luna observed abrasions and

redness around A.W.'s anal entrance.  *Id.* at 227.  Finally, swabs taken from

A.W.'s anus during the SANE tested positive for male DNA consistent with

Vigil's DNA.  *Id.* at 233, 235.  Whether this contact involved slight

penetration of A.W.'s anus, attempted penetration, or merely rubbing and

friction that A.W. perceived as penetration, it was not manifestly

unreasonable or plain error for the district court to conclude that this assault

occurred on February 4, 2018 shortly before Consuelo took A.W. to the

hospital.

> 4.     *Even if the district court did err, Vigil has not shown that*
> *vacating the jury verdict and remanding for a new trial*
> *would advance the fairness, integrity, or public reputation*
> *of the courts.*

An appellate court should exercise its discretion to notice a forfeited

error only if the error seriously affects the fairness, integrity or public

reputation of judicial proceedings.  *United States v. Olano*, 507 U.S. 725, 736

(1993).  Vigil cannot make this showing.  The error of which he complains —

the introduction of A.W.'s statements to her mother as present sense

impressions — involves a factual dispute that goes to the very heart of Vigil's

guilt.  Specifically, Vigil maintains that the evidence does not support a

finding that he sexually assaulted A.W. on February 4, 2018 and that the

district court, therefore, erred in finding that A.W.'s statements were substantially contemporaneous to the offense.

This is the same position Vigil advanced in closing argument at the jury trial. 3 ROA 1022-023 (contending that there was insufficient time in the approximately three minutes when Consuelo was in bed with A.W. and Vigil for Vigil to have caused the level of injury A.W. suffered).

In assessing this argument, the jury had the benefit of seeing Consuelo and making its own credibility determinations about the reliability of her testimony and of A.W.'s statements. For the Court to replace these assessments with its own findings about whether Vigil "reasonably" could have put his fingers in A.W.'s vagina and his penis in A.W.'s butt on February 4, 2018, as A.W. reported, would not advance the fairness, integrity, or public reputation of judicial proceedings.

As the ultimate factfinder, it was the jury's responsibility to resolve the parties' disagreement regarding the believability of A.W.'s account of the single assault she suffered at Vigil's hands. That determination should not be disturbed simply because this Court could view the evidence of Vigil's guilt and the credibility of Consuelo or A.W. differently than the jury did. *See United States v. Barletta*, 652 F.2d 218, 219 (1st Cir. 1981) (where a preliminary question regarding the admissibility of hearsay evidence "present[s] precisely the same question as an ultimate issue of fact in the

32

case," the court's role "is not to make a factual determination, but rather to rule as a matter of law whether a reasonable jury could properly find the ultimate fact in favor of the proponent of the evidence"). Vigil had a full and fair opportunity to contest Consuelo's credibility and argue to the jury that her account of the offense defied "logic" and "common sense." The Court should decline to retry this central issue on appeal in the guise of a preliminary hearsay finding under Federal Rule of Evidence 104(a).

     5.     *The district court did not abuse its discretion when it admitted A.W.'s statements to Consuelo as excited utterances.*

The district court also admitted A.W.'s statements to Consuelo as "excited utterances" which are "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). This exception has three requirements: (1) a startling event; (2) a statement made while the declarant was under the stress of the event's excitement, and (3) a nexus between the content of the statement and the event. *United States v. Ledford*, 443 F.3d 702, 710 (10th Cir. 2005). As he did in the district court, Vigil contends that A.W.'s statements do not meet the second requirement of the exception.

When assessing whether this condition has been met, courts consider a range of factors, including the amount of time between the event and the

33

statement, the nature of the event, whether the statement was volunteered, the age and condition of the person making the statement, visible signs of excitement, intervening events, and whether the declarant had a plausible motive to lie. *See United States v. Pursley*, 577 F.3d 1204, 1220 (10th Cir. 2009). "[T]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance." *Ledford*, 443 F.3d at 711. Unlike a present sense impression, admissibility depends on "a statement's contemporaneousness with the excitement a startling event causes, not the event itself." *United States v. Smith*, 606 F.3d 1270, 1279 (10th Cir. 2010)

In this case, although the record does not disclose precisely how much time elapsed between the startling event and the statement, the outer limit was roughly thirty minutes.[9] This length of time falls well "within the temporal range of trauma contemplated by Rule 803(2)." *Pursley*, 577 F.3d at 1221 (citing *United States v. Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) (allowing a

---

[9] Consuelo testified that she joined A.W. and Vigil in the bed around 2:10 a.m. 3 ROA 403. Consuelo and A.W. arrived at the hospital less than thirty minutes later, at 2:38 a.m. *Id.* at 408. For the reasons outlined in detail above, this Court should decline to consider Vigil's newly raised argument that Vigil's assault on A.W. did not occur on February 4, 2018. Given A.W.'s multiple statements, her physical injuries, and the DNA and serological testing, the district court did not clearly err when it found that there was only a short amount of time between Vigil's assault of A.W. in his bed and A.W.'s statements on the drive to the hospital.

34

lapse of four hours between a beating and a victim's statement at a battered women's shelter); *United States v. Tocco*, 135 F.3d 116, 128 (2d Cir. 1998) (allowing a lapse of three hours between the discovery that people were in the building and the declarant's statement admitting a role in arson); *see also Smith*, 606 F.3d at 1280 (the passage of time did not suggest the victim's stress had dissipated where less than two hours had passed after the victim was raped); *United States v. Farley*, 992 F.2d 1122, 1123, 1126 (10th Cir. 1993) (statements made by a child the day after being molested could have been admitted as excited utterances where the child was frightened and on the verge of tears when the statements were made).

Other factors also supported the district court's determination that A.W. made her statement while she was still under the stress of the startling event. The sexual assault of a child is an extremely shocking event that can cause persistent fear and distress. *See Farley*, 992 F.2d at 1226 (concluding that the rape of a five-year-old child could cause stress lasting from the day of the attack until the following morning).

Consuelo testified that A.W. was visibly scared, shocked, crying, and in pain when she made the statement. 3 ROA 407, 409.

This pain was not fleeting or minimal. When A.W. arrived at the second hospital for the SANE, Nurse Luna observed that A.W. was tearful and grimacing. 3 ROA 142, 475. A.W. was complaining of significant pain

35

from the moment Nurse Luna saw her. *Id.* at 191. Even mild touching of her genitalia was "excruciating." *Id.* at 152, 484-85. A.W. was in such pain and discomfort that medical professionals elected to use sedation to complete the examination. *Id.* at 152-54, 161. In short, A.W.'s pain was "profound." *Id.* at 169.[10] Pain of this severity weighs in favor of a finding that A.W. was under stress when she told her mother where she was hurting and explained how Vigil had injured her. *See Pursley*, 577 F.3d at 1221 (agreeing that "physical suffering" may "postpone the opportunity to reflect" and concluding that statements made while "in considerable pain" were properly admitted as excited utterances).

A.W.'s age strengthens this conclusion. As a six-year-old child, A.W. was unlikely to possess the motive or capacity to calmly reflect on her situation and manufacture false statements while in considerable pain. *See Farley*, 992 F.2d at 1226 (reasoning that a declarant's youth will "greatly reduce[] the likelihood that reflection and fabrication were involved"). Nor was there any time for such reflection. A.W.'s mother rushed her from Vigil's home immediately after the assault. There were no intervening events

---

[10] Vigil's own SANE expert testified that she did not doubt that A.W.'s vaginal irritation was causing her pain during the SANE. 3 ROA 288. Vigil also conceded in closing argument that A.W. was in pain, although he argued that the cause of this pain was unclear. *Id.* at 1022.

between the assault and A.W.'s statements that would have "diluted the effect of the event's trauma." *Pursley*, 577 F.3d at 1222.

Although Vigil avers that A.W. was calm when she left his house, this allegation does not outweigh the numerous other factors that bolster the district court's finding of admissibility.

As this Court has recognized, "[t]o come within the excited utterance exception, the declarant need not show signs of excitement immediately upon witnessing or experiencing a startling event. Rather, the declarant is simply required to still be under the continuing stress of excitement caused by the event or condition when making the statement." *United States v. Lossiah*, 129 F. App'x 434, 437 (10th Cir. 2005) (unpublished) (rejecting a defendant's contention that a child rape victim's statement could not qualify as an excited utterance because the child "initially appeared calm following the startling event").

The same reasoning applies with equal force here. The parties submitted conflicting evidence to the jury about A.W.'s behavior upon leaving Vigil's home. 3 ROA 112-13, 430. Even if the Court were to accept Vigil's version of events, A.W.'s failure to act distressed or unfriendly in the presence of her attacker does not compel a finding that A.W. was unaffected by the sexual assault. It is not unusual for an assault victim's behavior to be constrained by fear of an assailant.

Indeed, this Court has repeatedly affirmed the introduction of excited utterances made by distressed victims shortly after escaping a perpetrator's control or presence. *See Smith*, 606 F.3d at 1279-280 (rape victim's statements to her neighbor qualified as excited utterances where the victim made these statements "[a]t the first possible moment to disclose the assault to another person" after escaping from the defendant); *Pursley*, 577 F.3d at 1221 (focusing on the lapse of time between the victim's "removal from the presence of his assailants" and the excited utterances when determining whether the victim was still under the shock of the attack); *Farley*, 992 F.2d at 1126 (statements made to a five-year-old child victim's mother the day after a rape were admissible as excited utterances where the child was obviously frightened and upset and the child made the statements "relatively quickly after the child had an opportunity to speak with her mother alone").

As in these cases, A.W. quickly reported the assault to her mother upon leaving her assaulter's presence while in a state of pain and distress.   It was not arbitrary, whimsical, or manifestly unreasonable for the district court to admit A.W.'s statements to her mother as excited utterances under these facts.

38

## II.     <u>**The district court possessed jurisdiction over the offense.**</u>

In his final challenge, Vigil maintains that the district court lacked jurisdiction over the offense because his home is located on a private claim within the exterior boundaries of a pueblo and should not be considered Indian Country. Vigil concedes that *United States v. Antonio*, 936 F.3d 1117 (10th Cir. 2019) forecloses this argument. Vigil only raises the issue to preserve his ability to seek certiorari from the Supreme Court. Def. Br. 34. Because *Antonio* controls, this Court should deny Vigil's jurisdictional claim.

## **CONCLUSION AND STATEMENT CONCERNING ORAL ARGUMENT**

The district court did not abuse its discretion or plainly err when it admitted A.W.'s statements to her mother as excited utterances and present sense impressions.  The district court reasonably determined that A.W. made these statements shortly after Vigil assaulted her while in a state of pain and distress.  The Court should affirm the conviction.

The United States does not request oral argument.

Respectfully submitted,

FRED J. FEDERICI
Acting United States Attorney

*s/ Allison C. Jaros*

ALLISON C. JAROS
Assistant U.S. Attorney
P. O. Box 607
Albuquerque, NM 87103
(505) 346-7274
allison.jaros@usdoj.gov

## <u>TYPE-VOLUME CERTIFICATION</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 9,176 words.  I relied on my word processor to obtain the count.  My word processing software is Word 2016.

*s/ Allison C. Jaros*
ALLISON C. JAROS
Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION</u>**

I HEREBY CERTIFY that the foregoing brief was filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on May 13, 2021, and that seven photocopies of the foregoing brief will be sent by Federal Express to the United States Court of Appeals for the Tenth Circuit, Office of the Clerk, located at the Byron White United States Courthouse, 1823 Stout Street, Denver, Colorado, 80257, following notification that the electronic brief is compliant.

I ALSO CERTIFY that Devon Fooks, attorney for Defendant-Appellant Kevin Vigil, is a registered CM/ECF user, and that service will be accomplished by the appellate CM/ECF system.

I ALSO CERTIFY that any required privacy redactions have been made, and the copy of this document filed using the CM/ECF system is an exact copy of the hard copies filed with the Clerk.

I ALSO CERTIFY that the digital submission of this document has been scanned for viruses with scanning program McAfee Agent, version 5.6.6.232, most recently updated 5/13/2021, and, according to the program, the file is free of viruses.

*s/ Allison C. Jaros*
ALLISON C. JAROS
Assistant United States Attorney
